**PEOPLE of the State of Wyoming,**
**Appellant (Plaintiff),**

**v.**

**FREMONT ENERGY CORPORATION,**
**Appellee (Defendant).**

**No. 5670.**

Supreme Court of Wyoming.

Sept. 29, 1982.

Steven F. Freudenthal, Atty. Gen., Walter Perry III, Sr. Asst. Atty. Gen., Dennis M. Boal, Asst. Atty. Gen., argued, and Weldon S. Caldbeck, Asst. Atty. Gen., for appellant.

John Burk, argued, of Burk & Hunter, P.C., Casper, and Thomas J. Constantine of Constantine & Prochnow, Englewood, Colo., for appellee.

Before ROSE, C.J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

RAPER, Justice.

This appeal is taken from the dismissal of a complaint filed by the People of the State of Wyoming, appellant (State), which sought to collect a penalty from Fremont Energy Corporation, appellee (Fremont), for violation of the Wyoming Environmental Quality Act, § 35–11–101, et seq., W.S. 1977, and which also sought to enjoin such further violations. The basis for the dismissal was that, while the district court believed it had jurisdiction over the subject matter, it declined to exercise jurisdiction until all administrative remedies had been exhausted by the State. The question for

us to decide is whether, under the circumstances, the district court acted properly in dismissing the State's complaint.

We will reverse and remand for further proceedings.

■ The facts leading up to the district court's dismissal of the State's complaint are set out in the complaint and motion to dismiss and, for purposes of this appeal, are not in dispute. We note that, although there is no dispute about the facts relevant to our disposition of this matter, it is well accepted that, for purposes of a motion to dismiss, the entire matter will be viewed in a light most favorable to the plaintiff with all facts alleged in the complaint accepted as true. *People v. Platte Pipe Line Co.,* Wyo., 649 P.2d 208 (1982); *Moxley v. Laramie Builders, Inc.,* Wyo., 600 P.2d 733 (1979); *State Highway Commission v. Bourne,* Wyo., 425 P.2d 59 (1967).

Prior to June 2, 1981, Fremont Energy Corporation had, from 1977, drilled and abandoned 1,036 drill holes in Sweetwater County, Wyoming, while exploring for non-coal minerals. Fremont had reported these drill holes to the State by submitting an Abandoned Drill Hole Report. On June 2, 1981, a representative of the Land Quality Division of the Wyoming Department of Environmental Quality (DEQ) randomly selected twenty of Fremont's abandoned drill holes to inspect for compliance with the Environmental Quality Act and the rules and regulations promulgated thereunder. The inspection of the twenty abandoned drill holes was conducted that same day and led to the eventual claim by DEQ that sixteen of the drill holes inspected were not filled, capped, sealed, or the site restored in accordance with the requirements set out in § 35–11–404(c)(ii), (iii) and (v), W.S.1977.[1]

■ On July 22, 1981, DEQ, pursuant to § 35–11–701, W.S.1977, Cum.Supp.1981,[2] is-

1. Section 35–11–404(c)(ii), (iii) and (v), W.S. 1977, provides:
 "(c) 'Plugging, sealing and capping upon abandonment' means any hole drilled shall be abandoned in the following manner:
 \* \* \* \* \* \*
 "(ii) 'Sealing'.—Drill holes which have encountered any ground water shall be sealed by leaving a column of drilling mud in the hole or by such other sealing procedure which is adequate to prevent fluid communication between aquifers;
 "(iii) 'Surface Cap'.—Each drill hole is to be completely filled to the collar of the hole or securely capped at a minimum depth of two (2) feet below either the original land surface or the collar of the hole, whichever is at the lower elevation. If capped, the cap is to be made of concrete or other material satisfactory for such capping. The hole shall be backfilled above the cap to the original land surface;
 \* \* \* \* \* \*
 "(v) 'Surface Restoration'.—Each drill site shall be restored as nearly as possible to its original condition, including reseeding if grass or other crop was destroyed."

2. Section 35–11–701, W.S.1977, Cum.Supp. 1981, provides:
 "(a) If the director or the administrators have cause to believe that any persons are violating any provision of this act or any rule, regulation, standard, permit, license, or variance issued pursuant hereto, or in case any written complaint is filed with the department alleging a violation, the director,

through the appropriate administrator, shall cause a prompt investigation to be made.
 "(b) For surface coal mining operations, in the instance of a written complaint by any person which provides a reasonable basis to believe that a violation of this act exists, the investigation shall include a prompt inspection. In such event the director shall notify the person when the inspection is proposed to be carried out and the person shall be allowed to accompany the inspector during the inspection, subject to reasonable control by the inspector. The operator shall have a duty to exercise reasonable care for the person's safety only if his presence is known. However, this duty shall not include the duty to inspect the premises to discover dangers which are unknown to the operator, nor giving warning or protection against conditions which are known or should be obvious to the person. The operator or his designee shall be allowed to be present for any such inspection.
 "(c) For other than surface coal mining operations, if, as a result of the investigation, it appears that a violation exists, the administrator of the proper division *may*, by conference, conciliation and persuasion, endeavor promptly to eliminate the source or cause of the violation:
 "(i) In case of failure to correct or remedy an alleged violation, the director *shall* cause to be issued and served upon the person alleged to be responsible for any such violation a written notice which shall specify the provision of this act, rule, regulation, standard,

sued a written notice of violation detailing various violations of § 35–11–404, supra, at eight of the twenty inspected drill holes. No cease and desist order was issued with the notice of violation.[3] There is no record of when the notice of violation was served upon Fremont; however, the State's complaint indicates that Fremont received the notice of violation on July 28, 1981.

On August 3, 1981, Fremont, through its attorney, mailed a letter to DEQ requesting a hearing before the environmental quality council on the violations alleged by DEQ in its notice of violation. Fremont based its request on the provisions of § 35–11–701(c)(ii), W.S.1977, Cum.Supp.1981. The request was apparently timely.

On August 17, 1981, the attorney general, representing DEQ, denied Fremont's request for a hearing before the environmental quality council. The denial was based on an interpretation of § 35–11–701(c)(i) and (ii), supra, that the right to a hearing provided in § 35–11–701(c)(ii), is only provided where a cease and desist order has been issued with a notice of violation and not simply when a notice of violation alone has been issued. Since the attorney general believed that the notice of violation was not an order by itself, Fremont was not entitled to its requested hearing before the council. No further action was apparently taken on the request for a hearing.

During the week of September 7, 1981, DEQ made another inspection of the abandoned drill holes it had previously inspected in June. The State declares that none of the violations DEQ had noted, as a result of its earlier inspection, had been corrected. Therefore, on September 18, 1981, the attorney general initiated a civil action against Fremont, as the driller of the abandoned drill holes in question. The complaint alleged that Fremont had failed to adequately fill, cap, seal, or perform the proper site restoration when it abandoned sixteen of the twenty drill holes inspected by DEQ in violation of § 35–11–404(c)(ii), (iii) and (v), W.S.1977, together with the DEQ rules and regulations promulgated thereunder.[4] Fremont was thus liable for the civil penalties

permit, license, or variance alleged to be violated and the facts alleged to constitute a violation thereof, and *may* require the person so complained against to cease and desist from the violation within the time the director may determine;

"(ii) Any *order* is final unless, not later than ten (10) days after the date the notice is served, the person or persons named therein request, in writing, a hearing before the council. Upon the filing of a request the *order* complained of shall be stayed pending the council's final determination thereon;

"(iii) If after a hearing held pursuant to this section, the council finds that a violation has occurred, it shall affirm or modify such order previously issued, or issue an appropriate order or orders for the prevention, abatement or control of the violation involved or for the taking of other corrective action. If, after a hearing on an order contained in a notice, the council finds that no violation has occurred, it shall rescind the order. Any order issued as part of a notice or after hearing may prescribe the date or dates by which the violation shall cease and may prescribe timetables for action. Nothing contained in this subsection shall be construed as preventing any person from applying for a variance as provided in W.S. 35–11–601;

"(iv) At any hearing before the council, it may designate a person to be a referee and may authorize the referee to receive evidence, administer oaths, examine witnesses and issue subpoenas requiring the testimony of witnesses and the production of evidence and to make reports and recommendations with respect thereto. Any final determination based on the evidence received by any referee shall be made solely by the council.

"(d) *Nothing in this section shall be interpreted to in any way limit or contravene any other remedy available under this act, nor shall this section be interpreted as a condition precedent to any other enforcement action under this act.*" (Emphasis added.)

3. For our purpose a cease and desist order is an order of an administrative agency prohibiting an individual from continuing a course of conduct which violates a statute or a rule. *Precious Metals Associates v. Commodity Futures Trading Commission,* 620 F.2d 900 (1st Cir. 1980). Although the question of whether a cease and desist order would have been appropriate is not before us, it would seem that its applicability for a past violation of the act would be questionable.

4. The violations of DEQ rules and regulations alleged in the complaint were of Department of Environmental Quality, Land Quality Division rules and regulations, Ch. XV §§ 3(a)(2), 3(a)(3), and 3(b) which provide:

Section 3(a):

set out in § 35–11–901(a), W.S.1977, Cum. Supp.1981.[5]

On October 14, 1981, Fremont, under the provisions of Rule 12(b)(1), W.R.C.P., moved the district court to dismiss the complaint for lack of jurisdiction over the subject matter. On November 13, 1981, Fremont filed its brief in support of its motion. Fremont's argument was that, since it had requested a hearing before the council on the alleged violations set out in the notice of violation in accordance with its interpretation of § 35–11–701(c)(ii), supra, such hearing must be held before the State could seek penalties in a civil action in district court.

The State, in response, argued that § 35–11–901(a) and (b), supra, provides that the State can institute a civil action to recover monetary penalties for violation of the Environmental Quality Act and that the violations of § 35–11–404, supra, complained of, were violations of that act. The State further argued that § 35–11–701(d), supra fn. 2, clearly indicates that the State is not required to exhaust the administrative remedies provided in § 35–11–701, supra, in any event, prior to filing a civil action under § 35–11–901, supra.

On January 25, 1982, the district court granted Fremont's motion. However, the district court did not dismiss on the ground

---

"a. All drill holes sunk for the purpose of conducting exploration by drilling shall be capped, sealed or plugged in the manner described hereinafter:

\* \* \* \* \* \*

"(2) To prevent adverse changes in water quality or quantity, drill holes shall be sealed in the manner described in W.S. 35–11–401(c)(ii) which shall include but not be limited to:

"(a) Drilling muds used to seal exploration drill holes shall meet the following specifications, when using procedures provided in the latest current edition of American Petroleum Institute Standard Procedures for Testing Drilling Fluids:

"(i) Ten minute gel strength of at least 20 lbs/100 sq. ft.

"(ii) Filtrate volume not to exceed 13.5 cc.

"(b) For drill holes in gravel, scoria (clinker) or other materials resulting in lost circulation (drilling fluids cannot be circulated to the surface), the discoverer may use drill cuttings or other earthen materials to adequately backfill the hole.

"(c) The administrator and director may approve other procedures at the request of the discoverer.

"(3) Drill holes shall be capped in the manner described in W.S. 35–11–404(c)(iii) to ensure the safety of people, livestock, wildlife, and machinery in the area."

Section 3(b):

"b. Each drill site as defined in Chapter I, shall be restored as nearly as possible to its original condition, including:

"(1) Excess drilling mud and drill cuttings or any acid forming or toxic materials uncovered during or created by exploration by drilling shall be properly disposed of so as not to constitute a fire, health, or safety hazard during or after the exploration by drilling.

"(2) To the extent possible, any surface preparation of the drill site shall be accomplished in a manner consistent with Chapter IV, Section 2b., and, where applicable, Section 3a., Land Quality Rules and Regulations.

"(3) To the extent possible, topsoil removal and stockpiling shall precede any excavation within the drill site in a manner consistent with Chapter IV, Section 2c., and, where applicable, Section 3b., Land Quality Rules and Regulations.

"(4) To the extent possible, the discoverer shall reestablish the vegetative cover where vegetation has been removed or destroyed within the drill site by seeding, planting, transplanting, or by other adequate methods in a manner consistent with Chapter IV, Section 2d., and, where applicable, Section 3d., Land Quality Rules and Regulations."

5. Only subsections (a) and (b) of § 35–11–901, W.S.1977, Cum.Supp.1981, are pertinent to the resolution of this case and provide:

"(a) Any person who violates, or any director, officer or agent of a corporate permittee who willfully and knowingly authorizes, orders or carries out the violation of any provision of this act, or any rule, regulation, standard or permit adopted hereunder or who violates any determination or order of the council pursuant to this act or any rule, regulation, standard, permit, license or variance is liable to either a penalty of not to exceed ten thousand dollars ($10,000.00) for each day during which violation continues, or, for multiple violations by surface coal mining operations, a penalty of not to exceed five thousand dollars ($5,000.00) for each violation for each day during which the violation continues, which may be recovered in a civil action, and the person may be enjoined from continuing the violation as hereinafter provided.

"(b) Except for surface coal mining operations, damages are to be assessed by the court. \* \* \* "

that it lacked jurisdiction over the subject matter. The district court specifically acknowledged that it *did not* lack jurisdiction. The district court ordered "that jurisdiction is *declined* in favor of the appropriate administrative procedures for hearing * * *." In its opinion letter, the district court also indicated that the State's interpretation of § 35–11–701(c), supra, was too narrow and that DEQ's notice of violation was an order entitling Fremont to a hearing before the council. Therefore the district court ordered that Fremont be given "a hearing before the Environmental Quality Council on all violations raised by the Complaint * * *."

To decide whether the district court's dismissal of the State's complaint was proper, we shall discuss the pertinent issues that have been raised by the parties for our consideration in this case. These issues are in essence:

1. Is the State required to exhaust the administrative remedies set forth in § 35–11–701, supra, before commencing a civil action under § 35–11–901, supra, to collect penalties for violation of the Environmental Quality Act?

2. Was Fremont entitled to a hearing before the council under § 35–11–701(c)(ii), supra, on the allegations contained in the notice of violation it received from DEQ?

3. In dismissing the State's complaint, did the district court rely on either the doctrine of exhaustion of administrative remedies or the doctrine of primary jurisdiction; and if so, did it do so properly?

▉ To decide those questions, we are compelled to begin by examining the statutory framework that has been created to enforce the provisions of the Environmental Quality Act (Act). Specifically, we examine § 35–11–701, supra, and § 35–11–901, supra, hereinafter referred to as § 701 and § 901. At this point we note that this court has observed frequently that where a statute is clear on its face, there is no need to resort to rules of statutory construction. *People v. Platte Pipe Line Co.,* supra, 649 P.2d 208; *Board of County Commissioners*

*of Cty. of Campbell v. Ridenour,* Wyo., 623 P.2d 1174 (1981); *State v. Sinclair Pipeline Co.,* Wyo., 605 P.2d 377 (1980); *Matter of North Laramie Land Co.,* Wyo., 605 P.2d 367 (1980). We have also made it clear that the goal of the Environmental Quality Act is to protect the public. Therefore, when we deal with provisions of the Act, we recognize that they are entitled to a liberal construction to insure that the public is in fact protected from the menace the legislature has seen fit to address in the Act. *People v. Platte Pipe Line Co.,* supra.

As an overview, without going into great detail at this point, the general thrust of § 701 is to require that DEQ investigate suspected violations of the Act, notify the responsible party of alleged violations if the investigation has confirmed the earlier suspicions, and seek to eliminate the source of the violation without resort to the imposition of monetary penalties. Section 701 is the only section in article 7 of the Act entitled "Complaints." Section 901, on the other hand, is in the "Penalties" article of the Act and is geared toward the actual determination of a violation of the Act, as a matter of law, and the imposition of monetary penalties for the violation of the Act. Where § 701 is aimed at seeking to uncover and correct alleged violations without resort to the harshness of monetary penalties, § 901 provides the means to deal finally with violations not corrected by resort to § 701. Also, anytime after DEQ has discovered a suspected violation and feels compelled to seek enforcement by direct resort to § 901, § 701(d) provides that § 701 need not be considered a condition precedent to such action.

Except in the case where DEQ has chosen to issue a cease and desist order, pursuant to § 701(c)(i), there is no opportunity provided by § 701 for a review of DEQ's allegation of a violation prior to the final step of initiating a proceeding under § 901. Although we will elaborate on that last point in some greater detail later, for now let us simply state that, except where a cease and desist order has been issued, the only action that DEQ is permitted to take toward an

alleged violator under § 701 is to put that individual on notice that DEQ believes a violation exists. The individual can then act accordingly.

We now turn to a more detailed look at the language in both §§ 701 and 901 to aid in our analysis of the issue before us. To start, then, we note that § 701(a) creates a duty for DEQ to make a prompt investigation whenever there is reason to suspect that a violation of the Act or its associated rules, regulations, etc., has occurred. Section 701(a) is a general provision dealing with any suspected violation of the Act. Section 701(b) also deals with DEQ's duty to investigate suspected violations, but is specifically limited to investigations into suspected violations of surface coal mining operations.

Section 701(c) is at the heart of the controversy before us. Section 701(c) applies when it appears, as a result of an investigation conducted pursuant to § 701(a), that a violation of the Act exists. At this point, the statute provides the first of several options for DEQ to take in an effort to eliminate the alleged violation. The administrator of the proper division of DEQ is permitted by the statute's use of the term "may" to try to eliminate the source or cause of the alleged violation by conference, conciliation and persuasion. If DEQ has elected that option, § 701(c)(i), (ii), (iii), and (iv) are further steps in that procedure. If, on the other hand, the administrator of the proper division of DEQ chooses not to take that option, DEQ must go directly to § 901 to enforce the Act by penalizing its alleged violation.

If an administrator in DEQ has chosen to deal with the alleged violation by conference, conciliation, and persuasion, DEQ must determine whether the alleged violation has been remedied or corrected. If the alleged violation has not been remedied or corrected, the director of DEQ has no choice but to issue and serve a written notice of violation upon the person alleged to be responsible for such violation in accordance with § 701(c)(i). At the time the written notice of violation is issued, § 701(c)(i) pro-

vides that the director of DEQ has the option to include an order to cease and desist from such alleged violation of the Act with the notice of violation. It is important to note that, although § 701(c)(i) does not use the word "order," it states that the director of DEQ "may require the person so complained against to cease and desist from the violation." We take the use of the word "require" to indicate that § 701(c)(i) contemplates a cease and desist order from the director of DEQ.

In our view, if a cease and desist order has been issued with a written notice of violation pursuant to § 701(c)(i), then § 701(c)(ii) and (iv) apply to deal with the cease and desist order. Of course, if no cease and desist order was issued and served with the written notice of violation, then § 701(c)(ii), (iii), and (iv) have no effect. DEQ's only recourse after issuing and serving a written notice of violation without including a cease and desist order is to drop the matter, if the violation is eliminated, or to proceed to enforce the act by seeking a determination of violation and the imposition of a penalty under § 901(a).

Since no cease and desist order was issued in this case, we need not reach that issue; however, we shall nonetheless discuss § 701(c)(ii) and (iii) to clarify our interpretation. Section 701(c)(ii) and (iii), from the plain language contained therein, pertains to "orders" and not to "notices." Section 701(c)(ii) merely provides a timetable for when an appeal of an order made by DEQ to the environmental quality council must be sought before the order becomes final. It further provides that if an appeal of an order is sought, said order "shall be stayed pending the council's final determination thereon."

Section 701(c)(iii) provides the actions the environmental quality council can take after a hearing conducted on an order issued by DEQ. Essentially, if the council determines that a violation of the Act has occurred, it can affirm, modify, or issue a new order(s). Section 701(c)(iii) further provides that: "If, after a hearing on an *order contained in a notice,* the council finds that no

violation has occurred, it shall rescind *the order*." (Emphasis added.) Section 701(c)(iii) goes on to provide: "Any *order issued as part of a notice* or after hearing may prescribe the date or dates by which the violation shall cease \* \* \*." (Emphasis added.)

■ From the language in § 701(c)(ii) and (iii), it is clear to us that the order therein referred to is a cease and desist order and not simply a written notice of violation. Had the legislature intended that the mere allegation made by DEQ in issuing and serving a written notice of violation should entitle the individual served to a review before the council, it could have so stated by using the word "notice" along with the word "order" in § 701(c)(ii)—it did not. It is also clear that the legislature's use of the phrase "order contained in a notice" and "order issued as part of a notice" in § 701(c)(iii) indicates that the word "order" in § 701(c)(ii) does not encompass a notice of violation.

Next, we discuss § 701(d)—the provision which gives DEQ flexibility in the manner in which it acts to enforce the Act. Section 701(d), referring to the other provisions of § 701, states that:

"Nothing in this section shall be interpreted to in any way limit or contravene any other remedy available under this act, nor shall this section be interpreted as a condition precedent to any other enforcement action under this act."

Through the clear language contained in § 701(d), the legislature made its intent clear that DEQ can proceed at any time after discovering a violation of the Act to seek enforcement of the Act. The only means outside § 701 in which DEQ can enforce the Act is by seeking penalties for its violation in a civil action before a court as provided in § 901. This section allows DEQ to choose the method it believes will best lead to an elimination of the violation.

Finally, in our discussion of the statutes involved here, we reach § 901. We have, in our discussion so far, discussed § 901 to some extent by discussing its relationship with § 701. We now turn to the purpose it serves in the Act. Section 901 is entitled, "Violations of act; penalties," and, as its title implies, is concerned with the determination of violations of the Act and imposition of monetary penalties for such violations. Section 901(a) is the general provision for dealing with any violation of the Act. It allows DEQ, as we have discussed above, to seek monetary penalties for violations by initiating a civil action. Subsections (b) through (g) of § 901, on the other hand, deal specifically with the determination of violations by surface coal mining operators and the assessment of penalties for those violations. In the case of surface coal mining operations, the determination of whether a violation has occurred is made by DEQ, and DEQ then can assess penalties. Surface coal mine operators can then have their case heard by the council in a hearing conducted in accordance with the Administrative Procedure Act, § 9–4–101, et seq., W.S.1977. The district court only gets involved in cases dealing with surface coal mining violations as an appellate court hearing the appeal from the council's determination. As we have declared earlier, the case of surface coal mining violations is quite different than the one we have before us. In the case before us, we must deal with § 901(a) which puts the determination of violations of the Act and the assessment of penalties in the hands of the courts rather than the agency. The agency's, i.e., the Department of Environmental Quality's, only responsibility is to make the allegation of a violation, and the courts proceed from there as in the litigation of any case where evidence is taken and facts determined.

■ After this lengthy discussion of §§ 701 and 901, we reach the view held by the State on the first issue raised for our review that § 701(d) makes it quite clear that the State is not required to exhaust any of the administrative remedies set forth in § 701 before commencing a civil action under § 901 to collect penalties for violating the Act. We so hold. We have often stated that we will not presume that our legislature acted futilely. *People v. Platte Pipe Line Co.,* supra; *DeHerrera v. Herr-*

*era*, Wyo., 565 P.2d 479 (1977). Thus, the inclusion of § 701(d) with its language that § 701 will not be interpreted as a condition precedent to any other enforcement action under the Act, indicates that the legislature intended the State to have the flexibility to enforce the Act by resort to § 901 without exhausting the procedures in § 701.

We next turn our attention to the question of whether Fremont was entitled by the provisions of § 701(c)(ii) to a hearing before the council on the allegations contained in the notice of violation served by DEQ. We note that the district court reached the decision that § 701(c)(ii) did entitle Fremont to such a hearing. However, as previously stated, this court is not bound by a district court's decision on a question of law. *Matter of North Laramie Land Co.*, supra, at 373. Therefore, since the district court's decision was one of law, we are not bound by it. When we have the same material before us as did the district court, we examine it in the same manner as the district judge, there being no question of fact involved.

Under our view of the statute, there is no provision in § 701 for a review by the council of the allegations contained in a written notice of violation alone, because § 901 provides the alleged violator with a review of the allegation prior to the assessment of any penalty. The only instance in which an individual is entitled to a hearing before the council on an alleged violation, other than in the case of a surface coal mining violation, is when DEQ has taken some action that affects the alleged violator's operation before penalties are sought under § 901. The only such action that DEQ could take would be the issuance of a cease and desist order provided for in § 701(c)(i). Since DEQ did not issue a cease and desist order to Fremont when it served the notice of violation, Fremont was not at any time entitled to a hearing before the council on its alleged violations of the Act.

■ We finally reach the issue of whether, in dismissing the State's complaint, the district court relied on the doctrine of exhaustion of administrative remedies or the doctrine of primary jurisdiction and whether the application of either was proper. Both doctrines were discussed by the parties in their briefs. The district court did not, in either its opinion or its order dismissing the State's complaint, declare that it was applying either well-known doctrine. The district court, as we have mentioned in our discussion of the facts, used the term exhaustion of administrative remedies in its order, but it is not clear that the court was referring to the doctrine of exhaustion of administrative remedies. We suspect that it was attempting to apply the doctrine of primary jurisdiction because of some feeling on its part that it was not capable of judicially dealing with the technicalities of filling holes. We will review the applicability of both doctrines in regard to this case to address the concerns of the parties and to determine if we should apply our frequently stated rule that we must affirm on appeal if there exists any legally valid ground appearing in the record which supports the judgment. *Agar v. Kysar*, Wyo., 628 P.2d 1350 (1981); *Wightman v. American Nat'l Bank of Riverton*, Wyo., 610 P.2d 1001 (1980). We need to address the inapplicability of either doctrine.

We begin our discussion by setting out Mr. Justice Harlan's explanation of these two related administrative law doctrines in *United States v. Western Pacific R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956) in which he states:

"The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. 'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, un-

der a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. [Citation.]"

A similar but shorter expression distinguishing the two doctrines is that:

"Exhaustion applies where an agency alone has exclusive jurisdiction over the case; primary jurisdiction where both a court and an agency have the legal capacity to deal with the matter. * * *" Schwartz, Administrative Law § 165 (1976) at page 482.

This court has also had occasion to speak on both of these administrative law doctrines.

We look first at the applicability of the doctrine of exhaustion of administrative remedies. In *City of Cheyenne v. Sims,* Wyo., 521 P.2d 1347, 1349 (1974), this court adopted the view expressed by the United States Supreme Court in *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194, 203 (1969), under the doctrine of exhaustion of administrative remedies, " 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.' *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938) * * *." The exhaustion doctrine applies where an agency alone has been granted or found to possess exclusive jurisdiction over the case. The purpose of the doctrine then is to avoid premature interruption of the administrative process where the agency has been created to apply a statute in the first instance. *McKart v. United States,* Id.

In *City of Cheyenne v. Sims,* supra, this court dealt with an attempt by a taxpayer to have certain property held exempt from taxation in a declaratory judgment action. We said, in holding the issue of taxation was not properly before the court in the first instance, that when the sole original determination lies within a body other than the courts, it is proper to apply the doctrine of exhaustion of administrative remedies. Id. at 1349.

From our earlier determinations in the case before us, we declared that § 701(d) makes it clear that the State can bring an action in the courts pursuant to § 901 without first complying with any applicable administrative procedures set out in § 701. We have also decided that, except in the case where a cease and desist order has been issued with a notice of violation, there is no statutory provision for a review of an alleged violation by the environmental quality council. Therefore, it is obvious to us that the environmental quality council has no statutory grant of exclusive jurisdiction over the determination of a violation of the Act. Even if we held that there was some responsibility for determining a violation by the council—which we do not—§ 701(d) would stand to clearly manifest the legislature's intent that the council's jurisdiction was not exclusive. We, therefore, hold that the doctrine of exhaustion of administrative remedies is inapplicable to the present case and cannot be used to affirm the district court's decision to dismiss the State's complaint.

As an aside, we note that the district court acknowledged that it had subject matter jurisdiction over this matter but declined to exercise it. That indicates to us that the district court did not rely on the exhaustion doctrine to dismiss the State's complaint in that he acknowledged that the council did not possess exclusive jurisdiction to determine violations of the Act.

We turn our attention next to whether the doctrine of primary jurisdiction applies. The original case in which the doctrine of primary jurisdiction was announced was *Texas and Pacific Ry. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). In that case a suit was brought by a shipper to recover excessive charges which he had been compelled to pay because of the unreasonable interstate freight rates charged by the railroad. Although it was clear that such an action could be brought, the Supreme Court held that where there was an alternate course of action before the recently formed Interstate Commerce Commission (I.C.C.), the action should be

brought there originally. Id. at 448, 27 S.Ct. at 358. The Supreme Court acted on its belief that Congress had specifically intended that such interstate rate actions be brought originally before the I.C.C. Id.

 The view of the doctrine of primary jurisdiction held in *Texas and Pacific Ry. Co. v. Abilene Cotton Oil Co.,* supra, was that the doctrine determines whether the court or an administrative agency should make the initial decision in a case. As we have set out earlier, a more recent view of the doctrine is found in *United States v. Western Pacific R. Co.,* supra. There the Supreme Court talked in terms of courts suspending the judicial process until issues, which under a regulatory scheme have been placed within the special competence of an administrative body, have been decided. Mr. Justice Harlan went on in that opinion to state:

"No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. These reasons and purposes have often been given expression by this Court. In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions. [Citation.] More recently the expert and specialized knowledge of the agencies involved has been particularly stressed. [Citation.] The two factors are part of the same principle, 'now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and

consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.' * * *." Id., 352 U.S. at 64–65, 77 S.Ct. at 165.

The Supreme Court's view of the doctrine of primary jurisdiction has continued to be that adhered to in *United States v. Western Pacific R. Co.,* Id.; *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976).[6]

This court has also had occasion to discuss the doctrine of primary jurisdiction. In *Kearney Lake, Land & Res. Co. v. Lake DeSmet Res. Co.,* Wyo., 487 P.2d 324, 328 (1971), we cited with approval the view held by the United States Supreme Court in *United States v. Western Pacific R. Co.,* supra. We went on in *Kearney Lake,* supra, to cite approvingly from *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 68, 91 S.Ct. 203, 208, 27 L.Ed.2d 203, 209 (1970):

"'* * * When there is a basis for judicial action, independent of agency proceedings, courts may route the threshold decision as to certain issues to the agency charged with primary responsibility for governmental supervision or control of the particular industry or activity involved. * * *'" (Citation omitted.)

In *Kearney Lake* this court was faced with deciding whether the courts of this state or the board of control should make the initial decision in abandonment of a water rights case. It was held that, although there was concurrent jurisdiction in both bodies, the doctrine of primary jurisdiction would apply to allow the initial decision to be made by the board of control.

More recently the doctrine of primary jurisdiction was discussed by the Tenth Cir-

---

**6.** For an annotation on the United States Supreme Court's decisions in regard to the doc-

trine of primary jurisdiction, see Annot., 38 L.Ed.2d 796.

cuit Court of Appeals in regard to mineral claim disputes arising in Wyoming. *United States v. Zweifel,* 508 F.2d 1150 (10th Cir. 1975). The Tenth Circuit held that not all questions involving the location of mining claims were beyond the experience of the courts, therefore the courts need not defer all such questions to the expertise of the Interior Department. In that case the court went on to state:

"* * * An important principle underlying the doctrine of primary administrative jurisdiction is that 'in cases raising issues of fact not within the conventional experience of judges * * * agencies created by Congress for regulating the subject matter should not be passed over.' [Citation.] The desirability of court abstention diminishes where the court faces factual issues of the sort that it considers routinely." Id. at 1156.

In all of the aforementioned cases one thing stands out that is relevant to our discussion of the doctrine of primary jurisdiction in this case. That one thing is that in all of those cases the doctrine was only considered applicable where there was an agency that had, under some statutory scheme, the responsibility to decide the issues involved if the doctrine of primary jurisdiction were to be applied. The doctrine of primary jurisdiction applies where there is an agency that has been created by statute or regulation to deal with particular technical questions requiring a special expertise. There must have been some legislative intent to allow the question to initially be decided by a particular agency, i.e., the environmental quality council. Where it is clear from the terms or the implications of the statutory scheme authorizing administrative action, that the legislature did not intend the environmental quality council to make an initial determination, then the doctrine of primary jurisdiction cannot apply any more than could the doctrine of exhaustion of administrative remedies.

In the case before us, Fremont contends that the doctrine of primary jurisdiction should apply to allow the environmental quality council to make a determination on the issue of Fremont's alleged violation of the Act. The statutes, however, we repeat, do not contemplate the environmental quality council having that responsibility. The legislature clearly manifested its intent in § 901(a) that the courts make the determination in cases like the one here before us, i.e., a suit to recover penalties.

As we have explained, in all but one case—the issuance of a cease and desist order—§ 701(c) does not contemplate a role for the council in determining whether a violation of the Act has occurred. Clearly where there is no such role contemplated by the statute, we cannot create one by means of applying the doctrine of primary jurisdiction. Where the council has no responsibility or role under the statute to address the question presented here, we refuse to create such a responsibility or role. The doctrine of primary jurisdiction was created to determine who, with the responsibility of dealing with a matter, should deal with it initially. The doctrine was not designed to create a responsibility to deal with a matter in an agency which had no such responsibility before.

Fremont urges us to assert that the doctrine of primary jurisdiction applies because the question involved falls within the special expertise of the council. Fremont failed to make more than that naked assertion. There is no showing anywhere in the record that the council has an expertise beyond that possessed by a court. In fact, the statute and rules in question clearly set out how drill holes are to be filled. Witnesses can testify whether the drill holes were or were not filled in compliance with those requirements. Courts deal on a daily basis with matters far more complex than those involved here. Also, we note that agency expertise has been brought to bear in some degree because the agency involved, DEQ, has determined from its investigation that the statutes and rules have not been complied with and has, therefore, made the allegations of violation to be aired in the district court. Further, because the legislature enacted § 901(a), placing respon-

sibility in the courts to determine whether the Act had been violated, it is clear that they felt no special expertise on the part of the council was required to resolve such issues. Therefore, we find Fremont's primary jurisdiction argument without merit.

We hold, for the reasons stated above, that neither the doctrine of exhaustion of administrative remedies nor the doctrine of primary jurisdiction is applicable in this case. We further find that, since there were no further remedies the State could exhaust before proceeding to bring its complaint, the State had proceeded properly under the Act and the district court erred in dismissing its complaint.

Reversed and remanded for further proceedings consistent with this opinion.