767 F.2d 1234
 25 ERC 1881, 15 Envtl. L. Rep. 20,686
 Donald E. BROWN; Edith R. Brown; Edwin E. Brown; Betty
Wolsfeld; and West Chicago State Bank, as Trustee
u/t/a 213, dated September 16, 1969,
Plaintiffs- Appellants,
v.
KERR-McGEE CHEMICAL CORPORATION, a Delaware Corporation,
Defendant-Appellee.
 No. 84-1294.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 9, 1984.
Decided July 18, 1985.
 
 Walter P. Maksym, Jr., Botti Marinaccio & Maksym, Oak Brook, Ill., for plaintiffs-appellants.
 John C. Berghoff, Jr., Chadwell & Kayser, Ltd., Chicago, Ill., for defendant-appellee.
 Before WOOD and CUDAHY, Circuit Judges, and WISDOM, Senior Circuit Judge.*
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 This case is yet another lawsuit concerning the approximately forty-three acres of land known as the Kerr-McGee West Chicago Rare Earths Facility. See City of West Chicago v. United States Nuclear Regulatory Commission, 701 F.2d 632 (7th Cir.1983); Illinois v. Kerr-McGee Chemical Corp., 677 F.2d 571 (7th Cir.), cert. denied, 459 U.S. 1049, 103 S.Ct. 469, 74 L.Ed.2d 618 (1982). This time we are asked to decide whether the Atomic Energy Act, as amended, 42 U.S.C. Sec. 2011 et seq., preempts a request for a state-law injunction to remove nonradioactive hazards when the nonradioactive and radioactive materials are inseparable. We hold that the federal law preempts plaintiffs' request that the district court order the defendant Kerr-McGee to move the waste material to another location.
 
 I.
 
 2
 The Kerr-McGee property in West Chicago consists of an eight acre factory site, a twenty-seven acre storage and disposal site, and an eight acre intermediate site connecting the other two. From 1932 to 1973, Kerr-McGee and its predecessor companies used the factory area to process monazite ores containing thorium, a natural radioactive element, and then disposed of the solid and liquid wastes in the storage area. Kerr-McGee stopped processing monazite ores in 1973, but continues, under license from the Nuclear Regulatory Commission ("NRC"), to possess and store thorium ores at the West Chicago site. Pursuant to a July 1977 order of the NRC, Kerr-McGee has submitted to the NRC a proposed plan for decommissioning the inactive West Chicago site and for disposing of the contaminated materials. On May 27, 1983, the NRC issued its Final Environmental Statement ("FES"), which outlined eight alternative proposals and recommended that the buildings be razed and the wastes be encapsulated and stored on the site for an indeterminate time period. The Commission subsequently authorized the Atomic Safety Licensing Board ("ASLB") to hold a hearing on the FES--as requested by the Illinois Attorney General.
 
 
 3
 Plaintiffs-appellants Donald E. Brown, Edith R. Brown, and Betty Wolsfeld are the equitable and beneficial owners of two parcels of residential property whose backyards abut the Kerr-McGee site. Plaintiffs rent the 904 Joliet Street residence to Mr. and Mrs. R. Gill, and Donald Brown and his mother Edith reside at 914 Joliet Street.
 
 
 4
 Plaintiffs brought this action on a variety of state law tort theories. Plaintiffs allege that the buildings on the Kerr-McGee property are in such a state of disrepair as to constitute a public and private nuisance.[1] In addition, plaintiffs claim that rats from the disposal site have entered the Browns' backyard and made numerous holes. The plaintiffs also allege that the wastes dumped in the storage area include hazardous chemicals such as barium sulfate, sodium phosphate, ammonia, ethylenediaminetetraacetic acid, sulfuric acid, and kerosene. According to plaintiffs, the liquid wastes deposited in ponds at the disposal site by Kerr-McGee and its predecessors have permeated the soil and polluted the water table. The water table is further polluted, plaintiffs allege, as rain and melting snow percolate through the mounds of solid waste and thereby become contaminated. Plaintiffs claim that the underground waters near the Kerr-McGee site exceed the water pollution standards set by the Illinois Pollution Control Board. Donald Brown also stated at his deposition that rain drains off the waste piles and into his yard.
 
 
 5
 Plaintiffs' complaint requested three types of relief. Count I sought an injunction ordering Kerr-McGee to repair or destroy the existing structures on the property and to remove all the hazardous wastes to some other location. Count II sought compensatory damages, and count III sought compensatory and punitive damages. Kerr-McGee, offering affidavits that all the wastes are radioactive and arguing that federal law preempts a state-law injunction, moved for dismissal of that part of count I requesting that the wastes be removed and stored at some other location. The district court agreed that federal law preempted such relief and granted partial summary judgment for defendant Kerr-McGee.[2] Plaintiffs appealed the summary judgment order to this court.
 
 II.
 
 6
 We first consider whether the district court order granting partial summary judgment for defendant on count I is appealable. The order is obviously not final, and the district court did not certify the issue under 28 U.S.C. Sec. 1292(b). Appellants argue, however, that this court has jurisdiction under 28 U.S.C. Sec. 1292(a)(1) because the summary judgment had the practical effect of denying plaintiffs' request for permanent injunctive relief. We agree.
 
 
 7
 Section 1292(a)(1) provides that appellate courts have jurisdiction of interlocutory district court orders "granting, continuing, modifying, refusing or dissolving injunctions." 28 U.S.C. Sec. 1292(a)(1) (1982). The plaintiffs never moved for an injunction, but an order having the practical effect of denying an injunction is considered a denial of an injunction for purposes of section 1292(a)(1). See Carson v. American Brands, Inc., 450 U.S. 79, 83-84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981); Data Cash Systems, Inc. v. JS & A Group, Inc., 628 F.2d 1038, 1040 (7th Cir.1980). Here the plaintiffs' complaint sought injunctive relief in count I and damages in counts II and III. By granting partial summary judgment in favor of the defendant on plaintiffs' request that the wastes be moved elsewhere, the court denied the plaintiffs part of the injunctive relief they sought; thus the court's order constitutes a denial of an injunction for purposes of section 1292(a)(1). See Plymouth County Nuclear Information Committee, Inc. v. Boston Edison Co., 655 F.2d 15, 17 (1st Cir.1981).
 
 
 8
 Prior to the Supreme Court's decision in Carson, a finding that the summary judgment had the practical effect of denying an injunction would end our inquiry and we would take jurisdiction. See Data Cash Systems, Inc., 628 F.2d at 1040; cf. South Bend Consumers Club, Inc. v. United Consumers Club, Inc., 742 F.2d 392, 394 (7th Cir.1984). Carson, however, requires more. In Carson, the Court held that an interlocutory order of a district court is immediately appealable under section 1292(a)(1) only if the appellant demonstrates that the order has a "serious, perhaps irreparable, consequence," and that the order can be "effectually challenged" only by immediate appeal. Carson, 450 U.S. at 84, 101 S.Ct. at 996 (quoting Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 181, 75 S.Ct. 249, 252, 99 L.Ed. 233 (1955)). Although this two-part test seems straightforward, there is some disagreement--both among circuits and within this circuit--as to whether Carson applies when the interlocutory order addresses the merits of the claim.
 
 
 9
 In Carson, a discrimination case, the Supreme Court held that an appeal lay from a district court order denying a joint motion of the parties to approve and enter a negotiated consent decree. The Court decided that, because the order would cause the plaintiffs to lose both their right to settle the case and any job opportunities that might arise under the consent decree, the order had " 'serious, perhaps irreparable, consequences' that petitioners [could] 'effectually challenge' only by an immediate appeal." 450 U.S. at 90, 101 S.Ct. at 999.
 
 
 10
 Carson has raised some questions because, although the Supreme Court states that the "serious, perhaps irreparable, consequences" test is applicable to interlocutory judgments appealed under section 1292(a)(2), id. at 84, 101 S.Ct. at 996, the Court relies primarily on cases in which the interlocutory orders were not decisions on the merits of the appellants' claims. See Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 480, 98 S.Ct. 2451, 2453, 57 L.Ed.2d 364 (1978) (order denying class certification); Switzerland Cheese Association, Inc. v. E. Horne's Market, Inc., 385 U.S. 23, 24-25, 87 S.Ct. 193, 194-195, 17 L.Ed.2d 23 (1966) (appellants sought interlocutory review of district court's denial of appellants' motion for summary judgment); Baltimore Contractors, 348 U.S. at 177, 75 S.Ct. at 250 (district court order refusing to stay a state court accounting action pending arbitration). Consequently, several courts, including a panel of this circuit, have read Carson narrowly to apply only to interlocutory orders that did not reach the merits of appellants' claims or did not dispose of all requests for injunctive relief. See Winterland Concessions Co. v. Trela, 735 F.2d 257, 260-61 (7th Cir.1984); Center for National Security Studies v. Central Intelligence Agency, 711 F.2d 409, 412 (D.C.Cir.1983); Tokarcik v. Forest Hills School District, 665 F.2d 443, 446-47 (3rd Cir.1981), cert. denied, 458 U.S. 1121, 102 S.Ct. 3508, 73 L.Ed.2d 1383 (1982). These courts rely on General Electric Co. v. Marvel Rare Metals Co., 287 U.S. 430, 433, 53 S.Ct. 202, 203, 77 L.Ed. 408 (1932), for the rule that an interlocutory order disposing of all requests for injunctive relief and addressing the merits of the case is immediately appealable under section 1292(a)(1) and Gardner and Carson for the proposition that an order either not disposing of all requests for injunctive relief or not addressing the merits is immediately appealable only if the appellant shows a "serious, perhaps irreparable, consequence" that can be effectually challenged only by immediate appeal. See Winterland Concessions, 735 F.2d at 261 (citing Gardner, 437 U.S. at 481, 98 S.Ct. at 2453); Center for National Security Studies, 711 F.2d at 412-13 & n. 6; see also Gardner, 437 U.S. at 481 n. 7, 98 S.Ct. at 2453 n. 7 ("There is an important distinction between an order denying an injunction on the merits and 'one based on alleged abuse of a discretionary power over the scope of the action.' ") (quoting Stewart-Warner Corp. v. Westinghouse Electric Corp., 325 F.2d 822, 829 (2nd Cir.1963) (Friendly, J., dissenting)).
 
 
 11
 Other courts, including a different panel of this circuit, have held that Carson prescribes a broad rule applicable to all appeals under section 1292(a)(1)--whether or not the district court addressed the merits of the appellant's claim. See Carson, 450 U.S. at 84, 101 S.Ct. at 996; South Bend Consumers Club, 742 F.2d at 393-94; see also United States v. RMI Co., 661 F.2d 279, 281-82 (3rd Cir.1981); Gould v. Control Laser Corp., 650 F.2d 617, 621 (5th Cir.1981). This position is supported by the Supreme Court's suggestion in Carson that each of the prior cases on appellate jurisdiction under section 1292(a)(1) could be explained in terms of the "serious, perhaps irreparable, consequences" requirement. Carson, 450 U.S. at 84-86, 101 S.Ct. at 996-997; see Donovan v. Robbins, 752 F.2d 1170, 1173-74 (7th Cir.1985). Indeed, the Court even suggested that Marvel, the case now used as the basis for the "merits" distinction, reflected a finding by the Court that "serious, perhaps irreparable, consequences" would have resulted without an immediate appeal. Carson, 450 U.S. at 86 n. 11, 101 S.Ct. at 997 n. 11; see also Shirey v. Bensalem Township, 663 F.2d 472, 477 (3rd Cir.1981).
 
 
 12
 We need not resolve these inconsistencies, however, because in the present case the two analyses yield the same result. The courts adopting the "addressing the merits" approach have held that an interlocutory order denying, on the merits, a request for an injunction is immediately appealable under section 1292(a)(1) only if the order disposes of all pending requests for injunctive relief. See Winterland Concessions, 735 F.2d at 261. If some requests for injunctive relief are still pending in the district court, the appellant must show that the interlocutory order will cause serious, perhaps irreparable, consequences that can be effectually challenged only by immediate appeal. See Center for National Security Studies, 711 F.2d at 413. In the present case, the district court granted summary judgment for the defendant with respect to plaintiffs' request for an injunction ordering the wastes removed to "some other safe and distant location," but the court did not decide whether plaintiffs are entitled to the other requested injunctive relief. Thus, even though the district court addressed the merits of plaintiffs' claim for an injunction ordering removal of the wastes, the Winterland Concessions approach would require plaintiffs to show that the interlocutory order will result in serious, perhaps irreparable, harm. Since, as we noted above, the South Bend Consumers Club approach requires a showing of serious, perhaps irreparable, consequences for any appeal under section 1292(a)(1), see 742 F.2d at 393-94, in this case both interpretations of Carson will yield the same result.
 
 
 13
 In the present case, the depositions and the Final Environmental Impact Statement support plaintiffs' contention that toxic wastes at the Kerr-McGee site have contaminated their land. Plaintiffs-appellants further claim that such contamination has adversely affected their health. Since in reviewing a summary judgment we view all pleadings and supporting papers in the light most favorable to the non-moving party, see Trulson v. Trane Co., 738 F.2d 770, 771 (7th Cir.1984), we assume that detrimental health effects will result between now and the district court's final decision. Cf. RMI Co., 661 F.2d at 282 (no continuing harm during trial). Furthermore, according to plaintiffs, every rainfall or melting snow flushes more of the toxic wastes into their water supply. These effects, because they are more than compensable economic losses, cf. South Bend Consumer Club, 742 F.2d at 394, are serious, perhaps irreparable, consequences that plaintiffs can effectually challenge only by immediate appeal.[3] See Carson, 450 U.S. at 86-90, 101 S.Ct. at 997-999 (lost job opportunities constitute serious, perhaps irreparable, harm).
 
 
 14
 Citing Plymouth County Nuclear Information Committee, Inc., 655 F.2d at 18, defendant Kerr-McGee argues that plaintiffs' failure to seek a preliminary injunction precludes a finding that serious or irreparable harm will result pending the district court's final decision. We agree that a party's failure to seek preliminary injunctive relief is a good indication that the status quo can be maintained until the ultimate conclusion of the litigation. See South Bend Consumers Club, 742 F.2d at 394. But "a good indication" is not a conclusive bar to interlocutory appeal. See Kartell v. Blue Shield of Massachusetts, Inc., 687 F.2d 543, 553 n. 21 (1st Cir.1982). In Plymouth County, the plaintiff waited nearly a year and a half between the denial of its motion for a preliminary injunction and its appeal of the dismissal of that part of the complaint requesting injunctive relief. 655 F.2d at 17-18. In South Bend Consumers Club, the appellant delayed requesting a preliminary injunction. 742 F.2d at 394. Thus in both cases the parties' actions implied that no serious harm would occur without a preliminary injunction.
 
 
 15
 The present case differs in that here preliminary injunctive relief was impractical. Plaintiffs claim that the toxic wastes on Kerr-McGee's property have caused, and continue to cause, serious, perhaps irreparable, harm to plaintiffs' health and to their property. If Kerr-McGee were still creating and dumping toxic wastes on the site, plaintiffs could request a preliminary injunction enjoining Kerr-McGee from further dumping. But plaintiffs admit that Kerr-McGee has not operated the factory since 1973, and it would be irrational for a district court to enter a preliminary injunction ordering Kerr-McGee to remove all toxic wastes from the West Chicago site. See Triebwasser & Katz v. American Telephone & Telegraph Co., 535 F.2d 1356, 1360 (2nd Cir.1976) (purpose of a preliminary injunction is to maintain the status quo, not to give the moving party affirmative relief equivalent to the ultimate relief sought). Consequently, in the unusual circumstances of this case, we believe that plaintiffs' failure to request preliminary injunctive relief does not preclude a finding that the district court order will result in serious, perhaps irreparable, consequences that can be effectually challenged only by immediate appeal. We believe that appellants have met their burden to prove such consequences and we therefore find the order appealable under section 1292(a)(1).
 
 III.
 
 16
 The district court held that plaintiffs' request for an injunction ordering that the wastes be removed and stored elsewhere was preempted because such an order would conflict with the Commission's exclusive authority over the disposal of radioactive materials. Plaintiffs and amicus State of Illinois, relying on Illinois v. Kerr-McGee and 42 U.S.C. Sec. 2021(k), argue that federal law preempts state regulation of radiation hazards but not state regulation of nonradiation hazards. Furthermore, appellants argue, since Illinois law permits a court to order exhumation of hazardous wastes, see Village of Wilsonville v. SCA Services, Inc., 86 Ill.2d 1, 31-36, 55 Ill.Dec. 499, 514-16, 426 N.E.2d 824, 839-41 (1981), the district court can find that the nonradiation hazards of the Kerr-McGee wastes justify the removal of the wastes to another site. We disagree, however, and hold that when the radiation and nonradiation hazards are inseparable, federal law preempts a state-law injunction ordering removal of the wastes.
 
 
 17
 State law, and thus state law remedies, are preempted if federal law so pervades a given field as to evidence a congressional intent to occupy that field. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). Even if Congress has not entirely displaced state law in a field, state law is still preempted if an "actual conflict" exists between state and federal law. Id. Such a conflict occurs "when it is impossible to comply with both state and federal law" or "where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." Id.
 
 
 18
 When a state regulation concerns an activity involving radioactive materials, the preemption issue normally turns on whether the state is regulating radiation or nonradiation hazards. See, e.g., Northern States Power Co. v. Minnesota, 447 F.2d 1143, 1149-54 (8th Cir.1971) (radiation hazards), aff'd 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972); Marshall v. Consumers Power Co., 65 Mich.App. 237, 247, 237 N.W.2d 266 (1976) (nonradiation hazards). This distinction is reflected by the language of section 274(k) of the Atomic Energy Act ("AEA"), which states:
 
 
 19
 (k) Nothing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards.
 
 
 20
 42 U.S.C. Sec. 2021(k) (1982).[4] Thus the AEA preempts a state attempt to impose more stringent limitations on the radioactive effluents of a nuclear power plant. See Northern States Power, 447 F.2d at 1147-50. By contrast, states retain the power to determine the need for additional electrical capacity and they may choose not to build a nuclear power plant for economic reasons. See Pacific Gas and Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, 205-08, 103 S.Ct. 1713, 1722-24, 75 L.Ed.2d 752 (1983). Analogously, a private plaintiff may rely on state law to obtain injunctive relief from nonradiation hazards that do not involve radiation hazards. Illinois v. Kerr-McGee, 677 F.2d at 582.
 
 
 21
 If the nonradiation hazards at the Kerr-McGee site were separable from the radiation hazards, plaintiffs could maintain an action to have the nonradioactive wastes removed "to some other safe and distant location." See Village of Wilsonville, 86 Ill.2d at 35-36, 55 Ill.Dec. at 516, 426 N.E.2d at 841. Congress clearly did not intend federal law to "occupy the field" of nonradioactive hazardous waste disposal. See 42 U.S.C. Sec. 6929 (1982); City of Philadelphia v. New Jersey, 437 U.S. 617, 620-21 n. 4, 98 S.Ct. 2531, 2533-34 n. 4, 57 L.Ed.2d 745 (1978). Furthermore, because the plaintiffs seek to abate the nonradiation rather than the radiation hazards, removal of separable, nonradioactive material would not cause a conflict between state and federal law. See Illinois v. Kerr-McGee, 677 F.2d at 582. Our analysis is made somewhat more complex because, as both parties agree, the radioactive and nonradioactive materials are "inextricably intermixed."
 
 
 22
 In this case, we find no explicit congressional intent or pervasive federal scheme that preempts the state laws relied on by plaintiffs. When Congress evidences an intent to occupy a given field, any state law falling within that field is preempted. Silkwood, 104 S.Ct. at 621. Thus the AEA, which provides a pervasive scheme for regulating radioactive materials, preempts any state regulation of radiation hazards.[5] Northern States Power Co., 447 F.2d at 1147-50. But while an Illinois law regulating radiation hazards would be void, see Commonwealth Edison Co. v. Pollution Control Board, 5 Ill.App.3d 800, 801, 284 N.E.2d 342, 342 (1972), the laws relied on by plaintiffs are undoubtedly valid in some circumstances. These laws do not regulate radiation hazards but instead concern pollution standards, building codes, and public nuisance. Indeed, as we held in Illinois v. Kerr-McGee, plaintiffs can bring an action based on these laws against Kerr-McGee as long as the remedy involves no radioactive materials. 677 F.2d at 582.
 
 
 23
 Nonetheless, plaintiffs' request for injunctive relief is still preempted if a conflict exists between state and federal law. To determine whether a conflict exists, we must look to the facts of the case. Illinois v. Kerr-McGee, 677 F.2d at 581. The wastes at the West Chicago site, because they consist of "the tailings or wastes produced by the extraction or concentration of ... thorium from any ore processed primarily for its source material content," constitute "byproduct material" under the Atomic Energy Act, as amended by the Uranium Mill Tailings Radiation Control Act. 42 U.S.C. Sec. 2014(e)(2); see FES, at H-4, H-5 ("[A]t least 60% of the monazite ore was processed primarily for its source material content and the resulting tailings and wastes are clearly byproduct material."). The NRC has exclusive authority to regulate the radiation hazards of the byproduct material[6] and Kerr-McGee must obtain a license from the NRC for decommissioning the West Chicago site and disposing of the wastes. See 42 U.S.C. Sec. 2113-14.
 
 
 24
 Plaintiffs asked the district court to order Kerr-McGee to remove the wastes to "some other safe and distant location." Plaintiffs and amicus argue that the inseparability of the materials should not alter the analysis of Illinois v. Kerr-McGee; they suggest that the district court can find that the nonradiation hazards violate Illinois pollution laws and can order Kerr-McGee to move the wastes to some site that both satisfies Illinois pollution standards and meets the licensing standards of the Nuclear Regulatory Commission. This argument reads Illinois v. Kerr-McGee too broadly. In that case, we held only that, with respect to the nonradiation hazards, the City of West Chicago could "pursue its own remedies only to the extent that they do not conflict with NRC regulation of radiation hazards." 677 F.2d at 584.
 
 
 25
 In the Final Environmental Statement for the Kerr-McGee site, the NRC staff analyzed eight different disposal alternatives and recommended on-site encapsulation as the best alternative. Although the Commission has not yet decided which alternative to license, an injunction ordering Kerr-McGee to remove the byproduct material from the West Chicago site would, in effect, substitute the judgment of the district court for that of the NRC as to whether on-site encapsulation is the best method of storing this byproduct material. True, the injunction sought by plaintiffs would not order the NRC to license a specific waste disposal site, but it would prevent the NRC from choosing the site recommended by the NRC staff. Furthermore, if federal law does not preempt plaintiffs' request for an injunction, nothing prevents neighbors of other prospective sites from relying on state law to obtain injunctions preventing NRC consideration of those locations. Such state law remedies, though not attempts to regulate the radiation hazards of byproduct material, nonetheless interfere with the NRC's ability to choose the method of disposal that, in light of radiation, nonradiation, and economic considerations, is the most appropriate. We therefore hold that plaintiffs' request for an injunction ordering the Kerr-McGee wastes moved elsewhere is preempted because, if granted, the injunction would stand "as an obstacle to the accomplishment of the full purposes and objectives" of federal regulation of radiation hazards. Silkwood, 104 S.Ct. at 621.
 
 
 26
 Our holding does not leave plaintiffs without a remedy. Cf. Silkwood, 104 S.Ct. at 623; Illinois v. Kerr-McGee, 677 F.2d at 583. Congress instructed the NRC to ensure "that the management of any byproduct material ... is carried out in such a manner as ... the Commission deems appropriate to protect the public health and safety and the environment from radiological and nonradiological hazards" associated with the possession of byproduct material. 42 U.S.C. Sec. 2114(a)(1) (emphasis added); see also 42 U.S.C. Sec. 2114(c) (licensee may propose alternatives to Commission's requirements, but Commission may accept alternatives only if they will achieve an equivalent or greater level of safety). The Commission must also ensure that the approved disposal plan conforms with the standards set by the Environmental Protection Agency for the protection of the public health and the environment from the radiation and nonradiation hazards associated with the disposal of byproduct material. See 42 U.S.C. Sec. 2114(a)(2); see also 42 U.S.C. Sec. 2022(b)(1); Health and Environmental Protection Standards for Uranium and Thorium Mill Tailings, 40 C.F.R. Secs. 192.40-42 (1984). In the present case, the NRC staff has evaluated the radiation and nonradiation hazards of the eight alternatives, weighed these hazards against the costs of the alternatives, and recommended on-site encapsulation of the wastes. At the hearing on the FES, the plaintiffs may try to convince the NRC that, for reasons related to either radiation of nonradiation hazards, the West Chicago site is unfit for storing the byproduct material. If plaintiffs decide that participating in the upcoming hearing is too expensive, they can rely on the State of Illinois and the City of West Chicago, who will participate, to represent their interests.
 
 
 27
 For the foregoing reasons, plaintiffs' request for injunctive relief ordering Kerr-McGee to remove the mill tailings and other wastes to "some other safe and distant location" is preempted by federal law.[7] The order of the district court is
 
 
 28
 AFFIRMED.
 
 
 29
 CUDAHY, Circuit Judge, concurring in part and dissenting in part.
 
 
 30
 I agree with the analysis of the majority in section II of its opinion, in which it reasons that the district court order granting summary judgment on that portion of the complaint which seeks an injunction requiring Kerr-McGee to remove wastes from the West Chicago site is appealable, and that therefore this court has jurisdiction.
 
 
 31
 However, the majority finds preemption much too easily in section III. We are faced here with a situation in which legitimate concerns of the states and local residents may be ignored by the Nuclear Regulatory Commission. In this whole field Congress has been very reluctant to override state prerogatives. I do not think the courts should crash through the tangled thicket of waste disposal, and in the process upset the balance achieved by Congress between state and federal law.[1]
 
 
 32
 It is important, I believe, to begin by recognizing that this is not an action to force reduction in levels of radiological hazards as such. As the majority recognizes, the plaintiffs' action is based on state law concerning pollution standards, building codes and public nuisances. The majority also concedes that none of these fields of state regulation are preempted by the Atomic Energy Act. Further, since the suit is based on these grounds, I think Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), and Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Commission, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), not to mention this court's recent decision in Illinois v. Kerr-McGee Chemical Corp., 677 F.2d 571 (7th Cir.), cert. denied, 459 U.S. 1049, 103 S.Ct. 469, 74 L.Ed.2d 618 (1982), are more apposite than Northern States Power Co. v. Minnesota, 447 F.2d 1143 (8th Cir.1971), summarily aff'd, 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972). Indeed, it seems to me that Silkwood requires that we find no preemption here.
 
 
 33
 It is also important that we recognize, as the district court apparently did not, the nature of the proceedings presently pending before the NRC. See generally Kerr-McGee App. 22-32. Kerr-McGee is required to seek amendment of the license under which it operates the West Chicago site. It is presently asking the permission of the NRC to undertake its preferred course of disposal of the wastes in question, on-site encapsulation. Even if the NRC approves that application, it will only be permission for Kerr-McGee to so dispose of the wastes. Kerr-McGee will not be required to do so, and there appears to be nothing other than Kerr-McGee's economic interest which prevents it from applying to the NRC for permission to dispose of the wastes in a manner which complies with both federal and state law.
 
 
 34
 There is little doubt that state regulation of the radiation hazards associated with nuclear power generation is preempted by federal regulation, Northern States Power, 447 F.2d 1143, because "the Federal Government has occupied the entire field of nuclear safety concerns," Pacific Gas & Electric, 461 U.S. at 212, 103 S.Ct. at 1726, see Silkwood, 104 S.Ct. at 617. Cf. Pacific Gas & Electric, 461 U.S. at 205, 103 S.Ct. at 1722 (state regulation of "radiological safety aspects involved in the construction and operation of a nuclear plant" is preempted); id. at 223-29, 103 S.Ct. at 1732-35 (Blackmun, J. concurring) (state safety regulation not wholly preempted). However, Congress intended to preempt only the regulation of radiological hazards. Pacific Legal Foundation v. State Energy Resources Conservation and Development Commission, 659 F.2d 903, 923 (9th Cir.1981), aff'd sub nom. Pacific Gas & Electric, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); Northern States Power, 447 F.2d at 1149-50. See also Pacific Legal Foundation, 659 F.2d at 923 n. 32 (collecting cases holding same). "[T]he States exercise their traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like." Pacific Gas & Electric, 461 U.S. at 212, 103 S.Ct. at 1726 (emphasis supplied; footnote omitted). This is in accord with the language of section 274(k) of the Atomic Energy Act, which permits the states "to regulate activities for purposes other than protection against radiation hazards." 42 U.S.C. Sec. 2021(k). See Pacific Gas & Electric, 461 U.S. at 210, 103 S.Ct. at 1725.
 
 
 35
 The purpose of the state regulation is critical in determining whether the regulation is preempted. Pacific Gas & Electric, 461 U.S. at 213-16, 103 S.Ct. at 1727-28; Silkwood, 104 S.Ct. at 631 (Blackmun, J. dissenting). There is no claim here that the purpose of Illinois' nuisance law, building codes and pollution standards is to regulate the radiological hazards or nuclear safety aspects of nuclear fuel processing. Therefore these are not preempted by the Atomic Energy Act and the subsequent federal regulation. Pacific Gas & Electric, 461 U.S. at 216, 103 S.Ct. at 1728 ("[W]e accept California's avowed economic purpose as the rationale for enacting Sec. 25524.2. Accordingly, the statute lies outside the occupied field of nuclear safety regulation." (footnote omitted)). The fact that enforcement of these state laws may impact on how Kerr-McGee carries out its business at the West Chicago site is not conclusive that they are preempted. Indeed, the Supreme Court has twice in the past two terms allowed state regulation which has directly impacted on aspects of the nuclear industry that are regulated by the federal government.
 
 
 36
 In Pacific Gas & Electric v. State Energy Resources Conservation and Development Commission, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), the Court held that a California statute which prohibited the construction of any nuclear generating plants until a method for disposal of radioactive wastes was approved by the NRC was not preempted. The statute was based on the supposed possible economic unviability of nuclear generation of electricity unless such a disposal method was developed. Although the statute was based on economic considerations, which have long been regulated by the states, the statute gave the state an effective veto over the construction of any nuclear generating stations within its borders until certain safety issues were dealt with by the federal government. Since the purpose of the state statute was economic not radiation safety, it was not preempted, 461 U.S. at 216, 103 S.Ct. at 1728, even though it had an effect on the radiation hazards to which the people of California were exposed.
 
 
 37
 Just last year the court went even further when it decided Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). In Silkwood the Court upheld a state-authorized award of punitive damages for injuries caused by nuclear hazards even though the NRC was vested with exclusive regulatory authority over the safety aspects of nuclear development and there had been no significant violation of the federal safety standards. 104 S.Ct. at 619, 626. Punitive damage awards have a clear impact on federal safety standards, for in effect they set independent state safety standards. See Silkwood, 104 S.Ct. at 628-30 (Blackmun, J. dissenting); id. at 635 (Powell, J. dissenting). Yet the Court held that the award of punitive damages was not preempted. If punitive damages for violating a jury-imposed standard of radiological safety are not barred, then clearly injunctive relief based on state laws not having as their purpose the imposition of radiological safety standards cannot be preempted.
 
 
 38
 The majority makes much of the fact that the radioactive and nonradioactive materials are "inextricably intermixed," arguing that because of this inseparability state regulation of the nonradioactive materials is preempted by federal regulation of the radiological safety aspects of the radioactive material. While this argument might have some plausibility as an initial matter, it cannot be valid after Silkwood. Karen Silkwood was contaminated with plutonium from a Kerr-McGee processing plant. As the majority surely knows, plutonium is itself a radioactive material. The punitive damages awarded by the jury were to penalize the company for its conduct which allowed the release of this very material. On the majority's theory, these punitive damages are preempted, for if material is radioactive, then any nonradioactive aspects are "inextricably intermixed" with its radioactive aspects. Yet the Supreme Court held that the punitive damages were not preempted by the NRC's regulation of the safety aspects of the production of plutonium. A fortiori state regulation for otherwise permissible purposes of material that is not radioactive cannot be preempted even when the material is "inextricably intermixed" with radioactive material.
 
 
 39
 The majority notes that the NRC is currently considering a number of alternative sites for disposing of the wastes presently at the West Chicago site. The majority then speculates that individuals residing adjacent to these other sites or state authorities might bring injunctive actions similar to this one, and jumps to the conclusion that therefore this action is preempted. This approach is simply inadmissible. The majority is correct to be aware of the possibility of this conflict, in which the several states bar each of the options approved or considered by the NRC. But so far this conflict is possible, not actual, and it is sheer speculation to conclude that it will ever transpire. Currently there is no conflict between the federal and state schemes because it is not "physically impossible" for Kerr-McGee to comply with both. Silkwood, 104 S.Ct. at 626; Pacific Gas & Electric, 461 U.S. at 204, 103 S.Ct. at 1722; Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-18, 10 L.Ed.2d 248 (1963). A court should not delve into hypothetical situations seeking out conflicts where none clearly exist. Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 130-31, 98 S.Ct. 2207, 2216, 57 L.Ed.2d 91 (1978); see Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 446, 80 S.Ct. 813, 817, 4 L.Ed.2d 852 (1960).
 
 
 40
 This court has recognized these very principles in Illinois v. Kerr-McGee Chemical Corp., 677 F.2d 571 (7th Cir.), cert. denied, 459 U.S. 1049, 103 S.Ct. 469, 74 L.Ed.2d 618 (1982). In that case we stated that there must be "a direct conflict between federal and state law that cannot be reconciled. Courts are not to seek out conflicts where none necessarily exist,...." 677 F.2d at 579 (citations omitted: emphasis supplied). With all respect, it seems to me that the majority is seeking out a conflict where one does not necessarily exist in order to bolster its shaky argument for preemption. All Kerr-McGee need do in order to preclude any conflict is to request NRC permission for a disposal alternative which satisfies state law. Further, the hypothetical conflict postulated by the majority is one in which the state law might prohibit something the NRC would merely permit. "This sort of hypothetical conflict is not sufficient to warrant pre-emption." Exxon Corp., 437 U.S. at 131, 98 S.Ct. at 2216. See Pacific Gas & Electric, 461 U.S. at 218-19, 103 S.Ct. at 1729-30 ("Because the NRC order does not and could not compel a utility to develop a nuclear plant, compliance with both it and Sec. 25524.2 [the state statute] is possible."). I therefore conclude that the injunctive relief requested by plaintiffs is not preempted.
 
 
 41
 However, it does not follow from the fact that the requested injunctive relief is not preempted that it would be proper to grant that relief at this time. I believe that this is an apt and proper case for application of the doctrine of primary jurisdiction. The question underlying the plaintiffs' request for injunctive relief--whether the mill tailings material should be disposed of at the West Chicago site or elsewhere--is presently pending in the NRC administrative proceeding. The State of Illinois is one of the parties to that proceeding and has advanced the same position asserted by plaintiffs here. There is no contention that the state has not been adequately representing the plaintiffs' interests.
 
 
 42
 Primary jurisdiction is a common law doctrine dating back at least to Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). Primary jurisdiction
 
 
 43
 applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.
 
 
 44
 United States v. Western Pacific Railroad Co., 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). The Supreme Court has explained the reasoning underlying primary jurisdiction as follows:
 
 
 45
 [I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.
 
 
 46
 Far East Conference v. United States, 342 U.S. 570, 574-75, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). See also Bradford School Bus Transit, Inc. v. Chicago Transit Authority, 537 F.2d 943, 949 (7th Cir.1976), cert. denied, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977); see generally 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE, ch. 22 (2d ed. 1983); B. SCHWARTZ, ADMINISTRATIVE LAW 481-497 (1976).
 
 
 47
 Primary jurisdiction is applicable here. There are currently proceedings pending before the NRC concerning Kerr-McGee's application for a license for on-site encapsulation of the materials now located at the West Chicago site. The NRC is considering eight disposal alternatives. There is a possible, though not yet any actual, conflict between NRC recommendations and state law. Most important, the NRC presumably has some specialized knowledge and expertise in this field. Finally, I note that several other courts have applied the doctrine of primary jurisdiction in closely analogous situations when NRC proceedings were pending. See, e.g., Honicker v. Hendrie, 465 F.Supp. 414, 419 (M.D.Tenn.1979), aff'd mem., 605 F.2d 556 (6th Cir.), cert. denied, 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980); Paskavitch v. United States Nuclear Regulatory Commission, 458 F.Supp. 216 (D.Conn.1978); Nader v. Ray, 363 F.Supp. 946, 953 (D.D.C.1973).
 
 
 48
 The State of Illinois argues as amicus that primary jurisdiction is not applicable here because the plaintiffs' claims are based on state law and the NRC cannot enforce the relief requested. This argument is beside the point because primary jurisdiction is applicable even though the agency cannot grant the relief requested. See United States v. ICC, 337 U.S. 426, 464 n. 11, 69 S.Ct. 1410, 1430 n. 11, 93 L.Ed. 1451 (1949) (Frankfurter, J. dissenting); Lichten v. Eastern Air Lines, 189 F.2d 939 (2d Cir.1951); SCHWARTZ, supra, 491; see also id. 492 n. 253 (collecting cases). As a practical matter, if the NRC does adopt certain of the disposal proposals now before it, the plaintiffs will get the relief they seek, though on different legal grounds. If, on the other hand, the NRC fails to adopt one of those alternatives, the plaintiffs will not be left without a remedy. It must "be emphasized that primary jurisdiction gives the agency the first, not the last, word on the matter." SCHWARTZ, supra, 493. The initial, but not the final decision is given to the agency. Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 496-99, 78 S.Ct. 851, 860-62, 2 L.Ed.2d 926 (1958) (invalidating rate structure held to be within primary jurisdiction of Board in Far East Conference, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576, and United States Navigation Co. v. Cunard Steamship Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932)); see DAVIS, supra, Sec. 22:7.
 
 
 49
 In sum, I do not believe that this injunctive action based on state law has been preempted, but rather that the NRC has primary jurisdiction over the issue underlying this action. Therefore the majority errs in affirming the dismissal of count I of the complaint. But it would also be error for the district court to proceed further in this litigation at this time. The proper course is for this court to reverse and remand with instructions that the district court stay its proceedings pending the NRC's decision in the proceedings now before it. Pennsylvania Railroad Co. v. United States, 363 U.S. 202, 80 S.Ct. 1131, 4 L.Ed.2d 1165 (1960); Western Pacific Railroad, 352 U.S. at 64, 77 S.Ct. at 165; DAVIS, supra, 91-92. Cf. Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976) (stay under doctrine of primary jurisdiction of common law tort action for fraudulent misrepresentation not appropriate where, inter alia, no technical expertise was relevant, there was no need for regulatory uniformity and the issues were within the court's competence). With the NRC's consideration of the disposal issue before it, the district court could then go on to consider whether the state law interests have been adequately considered, whether there is an actual conflict between the state and federal requirements, and, if it is not physically impossible for Kerr-McGee to obey both state and federal law, what is the proper relief for these plaintiffs.[2]
 
 
 
 *
 The Honorable John Minor Wisdom, Senior Circuit Judge for the Fifth Circuit, is sitting by designation
 
 
 [1]
 The plaintiffs allege that the current conditions existing in the factory area include:
 a) open pits filled with refuse and chemicals;
 b) holes in floors two through four of building 9, averaging three feet in diameter;
 c) loose glass in windows;
 d) broken glass on pavement below windows;
 e) boards off windows;
 f) animal litter scattered throughout the buildings;
 g) fallen walls, debris, abandoned equipment, and chemicals;
 h) fallen, collapsed, and sagging roofing; and
 i) scattered empty beer cans, bottles, and other litter.
 Plaintiffs further claim that the area is accessible to the "public in general and children in particular through and over fences," and has "inadequate security and lighting."
 
 
 [2]
 Although the defendant phrased its motion as one to dismiss part of the complaint, the defendant submitted a copy of the FES, two affidavits, and portions of deposition testimony in support of its motion. Since the district court relied on at least the FES, we treat the motion as one for summary judgment. Fed.R.Civ.P. 12(c)
 
 
 [3]
 Although Carson requires both that the order cause "serious, perhaps irreparable, consequences" and that the order can be "effectually challenged" only by immediate appeal, the Supreme Court found the second prong satisfied in Carson because the serious, irreparable consequences could result between the time of the interlocutory order and the district court's final decision. Because the irreparable effects could result between the summary judgment and the appeal from the final judgment in the present case, an appeal from the final judgment may not provide plaintiffs adequate relief from the intervening harm. Thus the order can be effectually challenged only by immediate appeal
 
 
 [4]
 Although this provision applies only to the preemptive effect of section 274, the Supreme Court has interpreted section 274(k) as a reflection of the general distinction between federal and state authority to regulate activities covered by the Atomic Energy Act, as amended. See Pacific Gas and Electric Co. v. State Energy Resources Conservation & Development Comm'n, 461 U.S. 190, 210, 103 S.Ct. 1713, 1725, 75 L.Ed.2d 752 (1983)
 
 
 [5]
 States may assume responsibility for the regulation of some radiation hazards by entering an agreement with the NRC. 42 U.S.C. Sec. 2021(b). This provision is not applicable here, however, since Illinois has not entered such an agreement
 
 
 [6]
 As noted above, Illinois has not entered an agreement with the NRC to regulate the radiation hazards of byproduct material. See 42 U.S.C. Sec. 2021(b)
 
 
 [7]
 In his dissent, Judge Cudahy suggests that our holding cannot be valid after Silkwood. The Silkwood decision was based on legislative history that revealed a congressional intent to allow plaintiffs to recover damages for injuries caused by nuclear hazards. 104 S.Ct. at 622-25. Even in allowing the recovery of punitive damages, however, the Supreme Court suggested that federal law would preempt a state law damage award if the award caused an irreconcilable conflict between state and federal standards or if the imposition of a state standard would frustrate the objectives of the federal law. Id. at 626. Here, although the request is based on state regulation of nonradioactive hazards, an injunction ordering the wastes moved to some other location frustrates the objectives of federal law by preventing the NRC from choosing what may be the most appropriate method of storing this radioactive material. Therefore the request for an injunction is preempted
 In addition, Judge Cudahy's second footnote suggests that he may have read our holding too broadly. This appeal concerns only the plaintiffs' request for an injunction ordering the removal of the radioactive material from the West Chicago site. The plaintiffs may be able to obtain injunctive relief that does not require the removal of radioactive materials (e.g., erection of fences to prevent entry, extermination of rats). Moreover, once the NRC licenses a site, the state may regulate the nonradiation hazards so long as that regulation does not create an irreconcilable conflict or frustrate the objectives of the federal law. But neither of these issues has been tried or is before us. For today we hold only that federal law preempts a nonagreement state, see supra notes 5-6, or a plaintiff relying on state law from obtaining an injunction ordering the removal of radioactive wastes to some other site.
 
 
 [1]
 Whether Congress's reluctance to preempt is sound public policy for the long run is not for us to decide. It is abundantly clear to me, however, that Congress has been reluctant
 
 
 [2]
 The majority reaches the extreme and unprecedented conclusion that the NRC has, in effect, exclusive jurisdiction over nonradiation hazards at the site in question