**HERMES CONSOLIDATED, INC.,**
**Appellant (Defendant),**

v.

**PEOPLE of the State of Wyoming,**
**Appellee (Plaintiff).**

**No. 92–89.**

Supreme Court of Wyoming.

April 6, 1993.

Stanley K. Hathaway, Rick A. Thompson, and Rebecca L. Hellbaum of Hathaway, Speight, Kunz, Trautwein & Barrett, Cheyenne, for appellant.

Joseph B. Meyer, Atty. Gen., Mary B. Guthrie, Sr. Asst. Atty. Gen., and William J. Flynn, Asst. Atty. Gen., for appellee.

Before MACY, C.J., and THOMAS, CARDINE and GOLDEN, JJ., and URBIGKIT, J. Ret.

CARDINE, Justice.

After a bench trial, the district court entered an order which required Hermes Consolidated Inc. (Hermes) to implement hazardous waste remediation procedures at their refinery. Hermes appeals claiming that the State Department of Environmental Quality (DEQ) is pre-empted by an EPA federal consent decree entered pursuant to the federal Resource Conservation and Recovery Act (RCRA). We agree and reverse.

Appellant raises these issues:

1. Is the State of Wyoming pre-empted from regulating the defendant's refinery in a manner that is inconsistent and in conflict with regulations and a remediation plan imposed by the United States Environmental Protection Agency resulting from an action in the United States District Court of Wyoming?

2. Did the district court have statutory authority to order a remediation plan? Since the evidence did not demonstrate irreparable harm and there was no finding of irreparable harm by the court to support issuance of an injunction under the court's equitable powers, did the district court err in ordering a remediation plan characterized as injunctive relief?

3. Did the district court err in attempting to settle this case as a mediator, in admitting settlement documents into evidence during the trial and ordering settlement negotiations after the trial?

## FACTS

Hermes Consolidated, Inc., a Delaware corporation, purchased the oil refinery at Newcastle, Wyoming in 1977. The refinery had been built more than forty years earlier and operated by various owners during that period of time. Hermes continues to operate the refinery under the trade name Wyoming Refining Company (WRC).

When Hermes purchased the refinery, it was aware of its potential pre-existing environmental problems. In 1979, the State of Wyoming initiated environmental enforcement litigation against Hermes because WRC was in violation of a National Pollution Discharge Elimination System (NPDES) permit that they had been issued pursuant to the Clean Water Act. In August of 1979, the State and Hermes reached an agreement for resolution of the problems at the refinery and a consent decree was entered.

In 1983 the United States Environmental Protection Agency (EPA) started enforcement proceedings against Hermes for violations of the Resource Conservation and Recovery Act (RCRA). That action proceeded through the administrative process, an Administrative Law Judge and eventually the EPA Administrator. Hermes was dissatisfied with the result of the administrative process and initiated a suit in federal court against the EPA. EPA counterclaimed for additional violations of RCRA and the Clean Water Act and requested a full site investigation and assessment. Meanwhile, in 1985, Hermes and the State modified the NPDES consent decree.

In April of 1988, before the trial was to begin in federal court, Hermes and the EPA settled the case by agreement upon a

proposed consent decree. Pursuant to federal law, the consent decree was published in the Federal Register, and all interested parties were invited to submit comments. *See* 28 C.F.R. § 50.7 (1991). In addition, Hermes and the EPA met with State of Wyoming representatives, encouraged them to participate in the federal litigation, and made efforts to include the State of Wyoming's views in the consent decree.

On June 1, 1988, the federal consent decree was filed and entered in the United States District Court. The consent decree required comprehensive remediation.

On January 6, 1989, just seven months after Hermes had settled the dispute with EPA, the Attorney General of Wyoming commenced a state enforcement action by filing a second suit against Hermes in state district court. The State alleged that structures at the refinery as well as the standard operations of the refinery had caused the discharge of pollution in violation of state law. The State asked for a penalty of $10,000.00 per day and that further violations be enjoined.

Hermes contended that jurisdiction over the regulation of hazardous waste rested exclusively with the federal government under RCRA provisions. Hermes alleged that the State's actions violated the Supremacy Clause of the United States Constitution, United States Constitution Article VI, clause 2. Hermes also argued that, since the State had failed to adopt standards and obtain certification of its own hazardous waste program, it was pre-empted and lacked jurisdiction. Hermes moved for summary judgment which, on September 27, 1989, was denied by the district court.

Thereafter, following an eight-day bench trial, the district court issued its opinion letter on September 3, 1991, which asked both sides to submit remediation plans. The district court then, on October 23, 1991, entered findings of fact and an interim order. After a series of additional hearings, letters, and responses, the district court entered an amended final order which outlined the State's remediation plan that Hermes was to undertake at the refinery.

The district court certified its order as a final order. Hermes now appeals to this court asserting, among other objections, that the remediation required by the State directly conflicts with the remediation ordered by the EPA in the federal consent decree.

## THE FEDERAL RESOURCE CONSERVATION AND RECOVERY ACT

The Resource Conservation and Recovery Act was enacted in 1976. *See* William H. Rodgers, Jr., 3 *Environmental Law: Pesticides and Toxic Substances,* § 7.1 at 510 (1988) (hereinafter Rodgers, *Environmental Law* ). Substantial amendments were added in 1984 through the Hazardous and Solid Waste Amendments Act. Rodgers, *Environmental Law,* § 7.1 at 511. Two of the expressly stated purposes of RCRA are to: 1) assure that hazardous waste management practices are conducted in a manner which protects human health and the environment; and 2) require that hazardous waste be properly managed in the first instance thereby reducing the need for corrective action at a future date. 42 U.S.C. § 6902(b) (1988).

In order to execute the national policy of safe hazardous waste management, RCRA contains a cooperative federalism scheme. Under that scheme, a state may adopt regulations which at least guarantee the federal minimum in accordance with 42 U.S.C. § 6926(b) (1988), which provides:

Any State which seeks to administer and enforce a hazardous waste program * * * may develop and, after notice and opportunity for public hearing, submit to the Administrator an application * * * for authorization of such program.

██ If the EPA approves the state's proposed regulations, the state, rather than the EPA, is then authorized to regulate hazardous waste. State actions taken under the authorized program have the same force and effect as actions taken by the EPA as provided by 42 U.S.C. § 6926(d) (1988):

Any action taken by a State under a hazardous waste program authorized under this section shall have the same force and effect as action taken by the Administrator under this subchapter.

*See also* 40 C.F.R. § 271.3(b) (1992). If a state has not adopted regulations which have been submitted and approved, it is not an authorized state; EPA then administers the RCRA program. Alex S. Karlin, "Hazardous Waste Management," 3 *Environmental Law Practice Guide: State and Federal Law*, § 29.01[6][b] (Michael B. Gerard, general ed. 1992). *See also* 40 C.F.R. § 271.3(b)(1) (the requirements and prohibitions in § 271.1(j) [regulations implementing the Hazardous and Solid Waste Amendments of 1984] supersede any less stringent provision of a state program).

■ States that establish a federally approved comprehensive hazardous waste management program can receive several benefits including: federal grants in aid, access to federal technical expertise, control over enforcement, and elimination of secondary regulation by the federal government. *People v. Roth*, 129 Misc.2d 381, 492 N.Y.S.2d 971, 974 (Co.Ct.1985) (*citing* 42 U.S.C.A. §§ 6902, 6926; 40 C.F.R. § 271.1 *et seq.*). Approval of a state program does not totally divest the federal government of future control over the state's program nor does it give the state "unbridled" discretion in enforcement. *Roth*, 492 N.Y.S.2d at 974. In addition, because of the increased RCRA requirements through later amendments, states that have authorization may only have authorization to administer portions of the RCRA program. John C. Chambers, Jr. & Peter L. Gray, *EPA and State Roles in RCRA and CERCLA*, 4 Natural Resources & Environment 7, 8 (Summer 1989). Overlapping federal and state regulation can occur to a limited extent when there is partial authorization. A limited amount of overlapping authority can also occur when a state is in the process of obtaining EPA authorization. Although dual and overlapping regulation can occur, Congress designed the cooperative federalism scheme within RCRA so that one agency would

ultimately be regulating hazardous waste. 42 U.S.C. § 6902(a)(7) (1988).

### FEDERAL PRE-EMPTION

■ Hermes argues that the DEQ's actions are pre-empted by RCRA. In order to properly examine the ability of the state to regulate hazardous waste under RCRA, we utilize the United States Supreme Court's test for pre-emption.

As we recently observed in *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), state law can be preempted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted *to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law,* or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (citations omitted and emphasis added). Therefore, we examine whether Congress intended to totally or partially occupy the entire field of hazardous waste regulation. If there was not total occupation of hazardous waste regulation, then states are pre-empted only to the extent there is actual conflict with federal mandates which make it impossible to comply with the federal mandate.

■ Congress envisioned state and federal cooperation when it enacted RCRA. In the objectives section of RCRA, the law provides:

The objectives of this chapter are to promote the protection of health and the environment and to conserve valuable material and energy resources by—

\* \* \* \* \* \*

(7) establishing a viable Federal-State partnership to carry out the purposes of

this chapter and insuring that the Administrator will, in carrying out the provisions of subchapter III of this chapter, give a high priority to assisting and cooperating with States in obtaining full authorization of State programs under subchapter III of this chapter [.]

42 U.S.C. § 6902(a) (1988). Since the objectives of RCRA expressly mention federal and state cooperation, Congress made explicit its intention not to exclusively occupy the entire field of hazardous waste regulation. We conclude that Congress did not intend to occupy the entire field of hazardous waste regulation. *See also People v. Teledyne, Inc.*, 233 Ill.App.3d 495, 174 Ill. Dec. 688, 691, 599 N.E.2d 472, 475 (1992); *Chemclene Corp. v. Commonwealth, Dep't of Environmental Resources*, 91 Pa. Cmwlth. 316, 497 A.2d 268, 273 (1985).

Since Congress did not intend to occupy the entire field, pre-emption will occur if the state law conflicts with the federal law and complying with both would be impossible. In other words, state law will be pre-empted to the extent the remedies sought by the state conflict with the remedies ordered by the federal government.

While analyzing a pre-emption question under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), the Sixth Circuit Court of Appeals noted that the terms of the consent decree caused the pre-emption, not the provisions of the CERCLA statute, since CERCLA expressly provides for federal-state cooperation. *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1455 (6th Cir.1991). Therefore, we examine the terms of the federal consent decree and compare them with the state remediation plan.

■ A review of the federal consent decree and the state order will demonstrate the conflicts between the programs and the confusion over what Hermes must do to comply with each. We must ascertain whether Hermes, if it fully complies with the federal decree, will violate the state ordered remediation plan. If it fully complies with the state plan, will it violate the federal mandates? Although it is difficult to contrast all of the state provisions with the federal decree since the state provisions are often vague, we point to those sections where there is a clear conflict in the direction and implementation of the plans. The following are examples of the confusion and conflict.

## OVERALL APPROACHES TO THE SITE

The federal consent decree states that the decree is designed to address the release of hazardous waste and prevent discharges from the site. The federal decree is also very specific in defining hazardous constituent concentrations that are prohibited and in defining "Background Level Concentrations"—the concentrations to which the water should be returned. The federal approach is a containment approach. In contrast, the state plan mandates steps which are not aimed at containment of existing contaminates, but are aimed at removing all contaminates from the site. The state plan does not contain standards which define the condition to which the site should be returned, but leaves that open to later decision.

### LEADED TANK BOTTOM AREA AND BLOW–DOWN PIT

Under the federal decree, Hermes is required to excavate the blow-down pit and then backfill and cover it. Hermes is required to address the leaded tank bottom area by capping it and notifying via property records, for perpetuity, that the area contains hazardous waste and has been capped and closed.

The state plan addresses the same blow-down pit and leaded tank bottom area. The state plan calls for study and remediation or modification of those two facilities. The state plan conflicts with the federal decree since Hermes cannot both cap the facilities and perform additional study and some other unspecified remediation, such as excavation. The state plan does contain a purported savings clause which provides that Hermes is not required to disturb previous work required by the federal consent decree. However, the additional study pro-

visions and the broad remediation requirements relating to those two specific facilities represent an assertion of state jurisdiction over facilities that have been investigated, remediated and ordered closed by the EPA. The continued requirements of the state are in conflict with the EPA requirements.

### GROUNDWATER RECOVERY

 The federal consent decree requires Hermes to intercept and treat contaminated groundwater. The decree specifically notes that areas of contamination are still an open issue and leaves room for future additional solutions. The federal decree requires nine recovery wells and groundwater recovery equipment. The federal decree also requires a piezometer construction program and monitoring wells. The federal decree specifies detailed well drilling and sampling requirements. It also specifies intervals of field parameter monitoring, starting with daily monitoring and moving to semi-weekly monitoring. The federal decree requires that stream gauging records in Little Oil Creek and Cambria Creek be reported as part of the physical parameter monitoring. The federal decree requires that the recovery system be operated so that the corrective measures standards are achieved at each point and requires Hermes to maintain compliance.

The state plan requires groundwater contamination investigation. The state plan requires additional monitoring wells and an additional piezometer. The plan states that after the additional wells are drilled and the samples are analyzed, Hermes must submit a plan for additional recovery wells or other clean up methods if the samples reveal "unacceptably contaminated" groundwater. The state plan does not specify what amounts of hazardous constituents will constitute acceptable groundwater. In fact, under the state plan, the district court did not determine the goal to be achieved by any recovery well system in terms of achieving cleanliness of the groundwater.

The state district court stated that the additional recovery wells will be placed beyond the influence of the EPA system. The order provides that the court will conduct additional hearings on the specific location of the wells. This makes the order difficult for this court to review for actual conflict. However, this attempted savings clause does not save the state plan. The state is still requiring a different solution rather than stricter standards. As Hermes points out in its brief, it may be impossible to drill wells which would be beyond the influence of the EPA recovery system since the groundwater flows toward the EPA recovery wells. Therefore, additional wells might either be ineffective because groundwater would not flow toward them or they would interfere with the groundwater flowing toward the EPA recovery wells.

In addition to more study and more wells, the state plan requires Hermes to remove, treat and/or dispose of all wastes and contaminated soils which are identified during the state mandated soil and waste sampling plan. Thus, the state's plan is directed at contaminated soil removal. In contrast the federal plan is geared toward containment of the site. The state's plan is in direct conflict with the federal decree.

### PENALTIES AND CONTINUING OVERSIGHT

 The federal district court assessed Hermes a $25,000.00 penalty for its violations and set out additional stipulated payments if Hermes fails to comply with the federal decree. The decree provides the United States District Court with continuing jurisdiction for the purpose of ensuring compliance.

The state district court imposed a $20,000.00 penalty on Hermes. The state district court order also retains jurisdiction over the site. The State's broad assertion of jurisdiction is pre-empted by the actions taken by the EPA pursuant to RCRA. The State is not overseeing specific additional standards and regulations, rather it is attempting to oversee the entire site contemporaneously with the United States District Court.

We conclude that the remedies sought by the State through the DEQ do conflict with the remedies imposed by the EPA in the federal consent decree, and complying with both is impossible. Therefore, the provisions of the state plan are pre-empted by the federal decree.

The State argues that there is no actual conflict between the remedies. It argues that the federal consent decree did not cover the surface impoundments or the flare pit, and therefore the State should be able to pursue regulation of those areas. The problem with the State's argument is that it ignores the underlying goal of the federal consent decree. The underlying goal of the EPA corrective measures is to minimize or eliminate groundwater and soil contamination including any off-site contamination. Therefore, although the consent decree may not specifically mention each pond at the refinery, it does contain a total regulatory federal scheme that leaves no room for the State to regulate.

## FURTHER STUDY PROVISIONS IN THE STATE PLAN

Although other facilities such as the flare pit are addressed in the state plan, it is impossible to evaluate whether there is a conflict with the federal consent decree since specific remediation is not required in the state plan. Rather the state plan is to further study those facilities and then propose remediation. Because the assertion of state authority is so broad and because of its undefined final parameters, the further study and future remediation section also conflicts with the federal decree. The same can be said for the sampling of waste water treatment ponds requirement and the artisan well plans. The EPA has addressed the entire site to prevent deleterious health effects and to contain the contamination. Additional undefined state requirements only conflict with EPA's assertion of jurisdiction over the site.

Since the state plan provides for study but does not specify remedies, we examine testimony in the record concerning the general purposes behind each plan. The record reveals the following testimony.

Bryan Gooch Redd, lead counsel for the Department of Justice, explained the design of the EPA recovery system as follows:

The [consent decree remediation system] was designed primarily by the Department of Justice consultants with review by the company. The integral part of it is a system of nine wells that are drilled strategically throughout the facility. And those wells are designed to intercept ground water, basically it could create an enormous cone of depression that pulls the ground water towards the wells and pumps the ground water[.] * * * [T]he consent decree also required the installation of five monitoring wells that are also set up on the downgradient side of the recovery-well system. And those monitoring wells are designed to read the ground water, if you will, after it has been subjected to the recovery system and determine the limits that are set forth in the consent decree are met or not. * * * The purpose of the recovery system, at least as I envisioned it and as I believe it's reflected in the consent decree, is basically a containment system to prohibit the off-site migration of the contaminates.

According to Redd's testimony, even if some areas are not specifically enumerated in the federal consent decree, the federal plan is intended to solve the entire contamination problem at the refinery site. The State cross-examined Mr. Redd as follows:

Q. You wouldn't maintain that just because there is a health description in the consent decree, that means that the entire refinery site is addressed?

A. Our experts reached the conclusions that this recovery system would intercept contamination from the facility.

Mr. Redd stated further on redirect examination:

It was our intent that, yes, we—that the intent of the system, as incorporated in the consent decree, would be that it would intercept ground water, including whatever was in it.

The DEQ's conflicting view of necessary remediation was explained by Carol Wagner Pfarr of the DEQ as follows:

Q. Could it be that the recovery system EPA designed is working, but it needs more time?

A. I don't believe it will address dissolved constituent.

Q. How soon do you think all of the hydrocarbons from under the refinery can be, or can they ever be taken out?

A. I think total excavation I said would be—would take them all out. I mean, total excavation would do it.

Q. Of course, that means closing the refinery, doesn't it?

A. Common sense says that, yes.

■ In sum, the state plan, although undefined in many respects is directed at removing all contaminants including requiring excavation if needed. In contrast, the federal plan calls for containment of the site and implementation of the groundwater recovery system.

The Sixth Circuit's finding is relevant here:

[M]ore stringent state environmental laws must be incorporated by EPA into federal consent decrees if relevant and applicable, but thereafter the state may not seek other remedies that are at odds with the terms of the decree.

*Akzo Coatings,* 949 F.2d at 1457. Here the State's remediation plan is at odds with the federal decree. The federal decree seeks containment and remediation while the state plan seeks excavation of contaminated soils and removal instead of containment. The contrasting positions of the state and federal agencies is similar to those found in *People v. Teledyne, Inc.,* 233 Ill.App.3d 495, 174 Ill.Dec. 688, 599 N.E.2d 472 (1992). *Teledyne* involved two hazardous waste disposal sites. *Teledyne,* 174 Ill.Dec. at 689, 599 N.E.2d at 473. After it was discovered that contaminants were migrating, reports were made to the EPA. *Teledyne,* 174 Ill.Dec. at 690, 599 N.E.2d at 474. The EPA and the site owner, US Ecology, a subsidiary of Teledyne, agreed to a consent order which required study of the best solution. *Id.* After

study was completed, the EPA issued a final order which required contaminant source control and groundwater remediation. *Id.* The EPA found that soil and waste removal would be "dangerous, unnecessary, and impractical." *Id.* Contemporaneously with the activity of the EPA, the State of Illinois filed a complaint alleging violation of state statutes and seeking an injunction that would require US Ecology to exhume the wastes. *Id.*

US Ecology filed a motion for summary judgment in the state court action. *Id.* 174 Ill.Dec. at 691, 599 N.E.2d at 475. The trial court granted summary judgment in favor of US Ecology finding an actual conflict between the remedies sought by the state and the remedial requirement imposed by the EPA. *Id.* The district court judge stated "You can't keep this material buried and dig it up at the same time." *Id.* 174 Ill.Dec. at 691, 599 N.E.2d at 475. The district court judge also noted that the only evidence in the case was the evidence developed by the EPA, and the State was asking the court to review the same studies the EPA had reviewed and reach the opposite result. The Third District Appellate Court of Illinois upheld the trial court's dismissal of the state's action. *Id.* 174 Ill.Dec. at 689, 599 N.E.2d at 473.

The court of appeals in *Teledyne* followed the rationale of *Brown v. Kerr-McGee Chemical Corp.,* 767 F.2d 1234 (7th Cir.1985). *Id.* 174 Ill.Dec. at 692, 599 N.E.2d at 476. In *Brown,* adjacent property owners were seeking an injunction under state law for removal of nonradioactive toxic wastes. *Brown,* 767 F.2d at 1237. The applicable federal law in *Brown* gave the Nuclear Regulatory Commission exclusive authority to regulate radiation hazards. *Brown,* 767 F.2d at 1241. In holding that federal law, the Atomic Energy Act, preempted the state injunction, the Seventh Circuit reasoned:

"Such state law remedies * * * interfere with the NRC's [Nuclear Regulatory Commission's] ability to choose the method of disposal that, in light of radiation, nonradiation, and economic considerations, is most appropriate. We there-

fore hold that plaintiffs' request for an injunction ordering the Kerr–McGee wastes moved elsewhere is preempted because, if granted, the injunction would stand 'as an obstacle to the accomplishment of the full purposes and objectives' of federal regulation of radiation hazardous."

*Teledyne*, 174 Ill.Dec. at 692, 599 N.E.2d at 476 (*quoting Brown*, 767 F.2d at 1242). The court in *Teledyne* also relied on *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409 (6th Cir.1991). In *Akzo*, the EPA entered a consent decree, under CERCLA, which utilized a soil flushing remedy at the site. The State of Michigan intervened in the federal proceeding and sought removal and incineration of the contaminated soil. *Akzo*, 949 F.2d at 1422. The Sixth Circuit Court of Appeals held that Michigan's request for removal and incineration of the soil was properly dismissed because Michigan failed to show that the EPA remedy would not achieve the state standards. *Teledyne*, 174 Ill.Dec. at 692, 599 N.E.2d at 476 (*citing Akzo Coatings*, 949 F.2d 1409).

The authority relied on by the court in *Teledyne* is applicable here as is the *Teledyne* court's reasoning. We hold that the state law injunction and remediation plan requiring soil removal, additional study, and overlapping jurisdiction for future remedies would be " 'an obstacle to the accomplishment of the full purposes and objectives' of federal law embodied in RCRA and implemented by the [EPA] in that it would severely restrict the remedial options available to the federal agency." *Teledyne*, 174 Ill.Dec. at 693, 599 N.E.2d at 477. *See also ENSCO, Inc. v. Dumas*, 807 F.2d 743 (8th Cir.1986).

The State of Wyoming argues that it is imposing stricter standards, and its remediation plan is not pre-empted because of the savings clause in § 3009 of RCRA. *See* 42 U.S.C. § 6929 (1988). Section 3009 of RCRA provides:

Retention of State authority

* * * Nothing in this chapter shall be construed to prohibit any State or political subdivision thereof from imposing any requirements, including those for site selection, which are more stringent than those imposed by such regulations [issued under this subchapter].

42 U.S.C. § 6929 (1988).

■ There are two problems with the State's reliance on this subsection of RCRA. First, although § 3009 allows states to adopt more stringent regulations, it does not authorize them to defeat safe federal solutions. We agree that "where the savings clause provision of section 3009 has been considered, it has been construed to authorize local adoption of more stringent environmental standards than the [EPA] but not to allow local governments to directly subvert RCRA and [EPA] decisions by outright bans on activities federal authorities considered safe." *Teledyne*, 174 Ill.Dec. at 693, 599 N.E.2d at 477 (*citing ENSCO*, 807 F.2d 743); *see also City of Jacksonville v. Dep't of Pollution Control and Ecology*, 308 Ark. 543, 824 S.W.2d 840, 842 (1992); *Ogden Environmental Serv. v. City of San Diego*, 687 F.Supp. 1436 (S.D.Cal.1988); Daniel P. Selmi & Kenneth A. Manaster, *State Environmental Law*, § 5.04[4] at 5–21 (1989) (discussing *ENSCO*). Here, EPA considers a containment approach safe. DEQ actions, which are aimed ultimately at excavation, subvert the federal EPA consent decree.

The State's argument in this case is similar to the argument made by the State of Illinois in *Teledyne*. "Here plaintiffs do not claim that the environmental standards which the [EPA] is requiring US Ecology to attain are less stringent than Illinois standards. Instead, plaintiffs dispute the effectiveness of the remedies chosen by the [EPA] to protect human health[.]" *Teledyne*, 599 N.E.2d at 477. We construe, as did the *Teledyne* court, the savings clause provision in section 3009 as allowing "more stringent *requirements, i.e.* environmental standards [more stringent than] federal regulation." *Id.* But "[t]he savings clause does not allow local governments to demand different *remedies* than those ordered by the [EPA] where there is no challenge to the environmental standards to be attained." *Teledyne*, 599 N.E.2d at 477.

The State of Wyoming does not claim that the standards the EPA is requiring Hermes to meet are not as strict as state standards. Here the State does not specify what stricter standards are not being met, instead the DEQ disputes the remedies chosen by the EPA.

The other difficulty with the State's assertion of the RCRA savings clause is that the savings clause applies only to authorized states. Wyoming is not an authorized state. Nearly all states have been at least partially authorized by the EPA. One tally reports that as of February 1988, forty-four states "had been authorized and were administering all or part of the RCRA program. EPA administers the program exclusively in the remaining states." John C. Chambers, Jr. & Peter L. Gray, *EPA and State Roles in RCRA and CERCLA,* 4 Natural Resources and Environment, 7, 8 (Summer 1989). A review of another source indicates that the number of authorized states may be even higher. Deborah Hitchcock Jessup, *Guide to: State Environmental Programs, passim* (2d ed. 1990).

The State of Wyoming has failed to adopt state standards, submit them for approval and obtain authorization to regulate hazardous waste as is required by RCRA. As one author noted "Wyoming has not been granted primacy to enforce a *hazardous waste* regulatory program comparable to that under the federal Resource Conservation and Recovery Act." Deborah Hitchcock Jessup, *Guide to: State Environmental Programs,* at 632 (2d ed. 1990) (emphasis added). *See also* 40 C.F.R. §§ 272.2550 through 272.2599 (1992). *See also* Professor Mark Squillace & Edward W. Harris, *Wyoming, in 6 Environmental Law Practice Guide* § 93.10 (Michael B. Gerrard ed. 1992). Therefore, the State is unable to argue that it is requiring compliance with stricter standards. Since Wyoming is not an authorized state, the savings clause provision does not apply to it. Since we decide that the State was pre-empted because of actual conflict in the state remediation plan and the federal remediation plan, we need not address the full impact of the State's failure to become an authorized RCRA enforcement state. Our consideration is limited to the action the State has taken in this particular case. Given the State's status as an unauthorized state and its failure to point to stricter standards, we are unable to accept the State's argument that § 3009 of RCRA permits their enforcement action.

We also feel compelled to comment briefly on the State's failure to participate in the federal process which was attempting to resolve the problems at the refinery. The State of Wyoming made no attempt to intervene in the federal litigation. In 1983, the EPA commenced proceedings against Hermes. Hearings were held, and there was a finding against the refinery. Hermes appealed to the United States District Court for the District of Wyoming. Extensive discovery and work in the federal court continued for five years until the parties entered into a consent decree in 1988. The State of Wyoming was notified at all stages of the pending federal litigation, and the State's input and participation were requested.

Pursuant to law, all interested parties were given 30 days notice during which they could comment on the consent decree. The consent decree was, pursuant to regulation, published in the Federal Register for public comment. Neither the court nor any party received any comments. The Department of Justice communicated with the State and made it aware of the federal litigation on several occasions. In addition to several meetings and phone calls, attorneys from the Department of Justice utilized the State's files about the facility to gather information.

The State of Wyoming, at all times, declined to become involved, did not cooperate with Hermes and the EPA, and did not give their input or suggestions. Then, seven months after the federal consent decree was entered, the State filed the present suit against Hermes, and now, for approximately five years, has been litigating the very same things that were involved in the federal action over again.

This is a classic case of a citizen being whipsawed by a competing state agency. Hermes and EPA litigated the refinery hazardous waste problems in federal court for five years (1983–1988). The case was settled by entry of a consent decree. Seven months later, the State sued Hermes in state court. Now, in 1993, Hermes will have been in court for ten years litigating over hazardous waste at this small refinery at Newcastle, Wyoming. In essence, Hermes is a pawn in a contest in which the state refuses to accept and cooperate in federal enforcement, and Hermes is the loser after ten years in court with attendant costs and expenses of litigation.

The State's failure to act is troubling not only because of its effect on Hermes and the national policy of RCRA, but also because the legislature has expressly mandated that the director of the DEQ cooperate in federal actions. Section W.S. 35–11–109 provides:

> (a) [T]he director of the department shall:
>
> \* \* \* \* \* \*
>
> (ii) Advise, consult and cooperate with other agencies of the state, the federal government, other states, interstate agencies, and other persons in furtherance of the purposes of this act[.]

and also

> (viii) The director shall cooperate and participate in the negotiation and execution of consent orders, permit issuance, site investigations and remedial measures by and between federal agencies and the owners or operators of Wyoming facilities *where the department has not been delegated the authority to administer and enforce federal legislation[.]* [emphasis added]

There was serious failure on the part of the State of Wyoming to function as the legislature intended in the entry of the federal consent decree.

The record can be searched in vain to ascertain a logical reason why the State would expend time, money and effort on this litigation after sitting out the federal litigation and refusing to become involved for five years.

The State explained its failure to act during the trial:

> THE COURT: Why didn't you intervene in Federal Court? Are you afraid of Federal Court?
>
> [STATE'S COUNSEL]: I guess it's the same reason that EPA doesn't come into state court. We want to enforce our state laws in front of our state court judges.
>
> THE COURT: Is that a policy [that] has been made by the Attorney General, as far as you know?
>
> [STATE'S COUNSEL]: As far as I know.

This policy is not acceptable under RCRA. 42 U.S.C. § 6902(a)(7) (1988). The result of this policy is that a business is subject to dual regulation. This flies directly in the face of the RCRA cooperative federalism design whereby a single agency, either state or federal, administers the RCRA program. 42 U.S.C. § 6926(b) & (d) (1988). RCRA does not contemplate that state and federal agencies will regulate simultaneously and thereby create a dual burden on the regulated industry. In order to ensure uniform national regulation of hazardous waste, RCRA emphasizes cooperation. 42 U.S.C. § 6902(a) (1988).

We also stress that we do not undertake this decision because of a policy consideration which would favor business over the health of the citizens of this state. That judgment is not ours to make. We recognize that hazardous waste is a dangerous threat to humans and to the environment. However, we are bound by the law in this case which holds that pre-emption occurs when the state decree conflicts with the federal consent decree under RCRA, and in this case there is the additional consideration that the State has failed to become an authorized regulatory body under RCRA.

Because we reverse the district court's order, we need not address appellant's other claims of error.

### CONCLUSION

Because the remediation sought by the State conflicts with the remediation or-

dered by the United States District Court's consent decree, we hold that the State is pre-empted from asserting regulatory authority over the refinery.

For the reasons stated herein, we reverse and vacate the judgment and order entered by the district court.

THOMAS, Justice, concurring specially, with whom GOLDEN, Justice, joins.

The majority opinion reverses the judgment of the trial court upon a finding of federal preemption in this instance. I agree with the result and rationale of the majority in this regard. Because the ground for reversal is federal preemption, it is not necessary to address other issues in the majority opinion.

In their briefs and arguments, the parties debated whether the State can seek injunctive relief pursuant to the provisions of Wyo.Stat. § 35–11–901 (1988). That statute provides:

(a) Any person who violates, or any director, officer or agent of a corporate permittee who willfully and knowingly authorizes, orders or carries out the violation of any provision of this act, or any rule, regulation, standard or permit adopted hereunder or who violates any determination or order of the council pursuant to this act or any rule, regulation, standard, permit, license or variance is liable to either a penalty of not to exceed ten thousand dollars ($10,000.00) for each day during which violation continues, or, for multiple violations by surface coal mining operations, a penalty of not to exceed five thousand dollars ($5,000.00) for each violation for each day during which the violation continues, which may be recovered in a civil action, **and the person may be enjoined from continuing the violation as hereinafter provided.**

(b) Except for surface coal mining operations, damages are to be assessed by the court. For surface coal mining operations, all notices for abatement and cessation orders shall be reported to the director. The director shall:

(i) Issue a notice of assessment, if a cessation order was issued;

(ii) Make a determination on whether a notice of assessment will be issued, if a notice for abatement was issued.

(c) Upon issuance of a notice of abatement or cessation order, the director shall inform the operator of the proposed amount of the penalty within thirty (30) days. The amount shall be determined in accordance with rules and regulations promulgated by the council. The person charged with the penalty shall have fifteen (15) days to request a conference with the director for informal disposition of any dispute over either the amount of the penalty or the occurrence of the violation.

(d) If a conference is held and after the director has determined that a violation did occur and the amount of the penalty which is warranted, the person charged with the penalty shall, within fifteen (15) days, either:

(i) Pay the proposed penalty in full; or

(ii) Petition the council for review of either the amount of the penalty or the fact of the violation, submitting a bond equal to the proposed amount of the penalty at the time of filing the petition. The bond shall be conditioned for the satisfaction of the penalty in full, or as modified by the council, if the director's determination as to the occurrence of the violation and the assessment of a penalty are affirmed. The petition is effective when the bond is approved by the council. If the bond is not approved, the person charged with the penalty has ten (10) days to forward the proposed amount to the council for placement in an escrow account in order to make the petition effective.

(e) If a conference is not requested, the person charged with the penalty has thirty (30) days to take the action described in subsection (c) of this section.

(f) After a petition is effective, the council shall hold a hearing, which shall be conducted as a contested case proceeding, as required by the Wyoming Administrative Procedure Act [§§ 16–3–

101 through 16-3-115]. The council shall either:

(i) Determine the occurrence of the violation and the amount of penalty which is warranted for the purpose of ordering that the penalty be paid; or

(ii) Determine that no violation occurred, or that the amount of penalty should be reduced. If such a determination is made either through administrative or judicial review, the director shall within thirty (30) days remit the appropriate amount to the person, if any deposit has been made, with interest at the rate of six percent (6%), or at the prevailing department of the treasury rate, whichever is greater. Failure to file an effective petition shall result in a waiver of all legal rights to contest the violation or the amount of the penalty.

(g) Any person aggrieved or adversely affected in fact by a final decision of the council pursuant to this section is entitled to judicial review in accordance with the Wyoming Administrative Procedure Act.

(h) Any person who violates this act, or any rule or regulation promulgated thereunder, and thereby causes the death of fish, aquatic life or game or bird life is, in addition to other penalties provided by this act, liable to pay to the state, an additional sum for the reasonable value of the fish, aquatic life, game or bird life destroyed. Any monies so recovered shall be placed in the general fund of Wyoming, state treasurer's office.

(j) Any person who willfully and knowingly violates, or any director, officer or agent of a corporate permittee who willfully and knowingly authorizes, orders or carries out the violation of any provision of this act or any rule, regulation, standard, permit, license, or variance or limitations adopted hereunder or who willfully violates any determination or order of the council or court issued pursuant to this act or any rule, regulation, standard, permit or limitation issued under this act shall be fined not more than twenty-five thousand dollars ($25,000.00) per day of violation, or imprisoned for not more than one (1) year, or both. If the conviction is for a violation committed after a first conviction of such person under this act, punishment shall be by a fine of not more than fifty thousand dollars ($50,-000.00) per day of violation or by imprisonment of not more than two (2) years, or both.

(k) Any person who knowingly makes any false statement, representation or certification in any application, record, report, plan or other document filed or required to be maintained under this act or who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under this act, shall upon conviction, be fined not more than ten thousand dollars ($10,000.00) or imprisoned for not more than one (1) year, or both.

(m) Any person who shall, except as permitted by law, willfully resist, prevent, impede, or interfere with the director, any administrator, or any of their agents in the performance of duties in the regulation of surface coal mining operations shall be punished by a fine of not more than five thousand dollars ($5,000.00) or by imprisonment for not more than one (1) year in county jail, or both.

(n) Any operator of a surface coal mining operation who fails to correct a violation within the period permitted for its correction, or after a final order or decision issues requiring correction when either the department or a court has relieved the operator from the abatement requirements of the notice or order, shall be assessed a civil penalty of not less than seven hundred and fifty dollars ($750.00) for each day during which the failure or violation continues.

(o) Except as provided in subsection (p) of this section, nothing in this act shall be construed to abridge, limit, impair, create, enlarge or otherwise affect substantively or procedurally the right of any person to damages or other relief on account of injury to persons or property and to maintain any action or other appropriate proceeding therefor.

(p) Any person who is injured in his person or property through the violation

**1316**

by any operator of any rule, regulation, order or permit issued pursuant to this act as it provides for the regulation of surface coal mining and reclamation in accordance with the requirements of P.L. 95–87 [30 U.S.C. § 1201 et seq.] may bring an action for damages (including reasonable attorney and expert witness fees) only in the judicial district in which the surface coal mining operation complained of is located.

(q) All actions pursuant to this article shall be brought in the county in which the violation occurred or in Laramie county by the attorney general in the name of the people of Wyoming. All actions pursuant to this article for the enforcement of any program to administer the provisions of W.S. 35–11–301(a)(iii) and (v) pursuant to the authority delegated under W.S. 35–11–304 may also be brought by the county attorney in the county in which the violation occurred. (Emphasis added.)

The State relies upon the emphasized language of Wyo.Stat. § 35–11–901(a) to justify seeking injunctive relief under the statute.

In my opinion, Hermes Consolidated, Inc., correctly points out that nothing contained in the statute following subdivision (a) serves to justify the claim for injunctive relief pursuant to this statute. I would hold that the avenue to injunctive relief is found by pursuing the procedure to arrive at a cease and desist order set forth in Wyo.Stat. § 35–11–701. I believe that this is a logical extension of the rationale found in *People v. Fremont Energy Corp.*, 651 P.2d 802 (Wyo.1982), which is limited to a suit to recover penalties. If there is no compliance with the cease and desist order, the State appropriately could seek judicial enforcement by an action for an injunction. I would also reverse the decision of the trial court as to the injunctive relief for the reason that Wyo.Stat. § 35–11–901 does not authorize the injunctive relief sought and obtained by the State.